In the Matter of the Will of Mary Hannaher, Deceased. Patrick Hannaher, Executor and Proponent, Appellant v. Nellie Reynolds et al., Contestants.

**Wills:** CONTEST: VERDICT: REVIEW OF EVIDENCE ON APPEAL. Where a will contest has been submitted to a jury as provided by statute the only duty of the appellate court in a review of the evidence is to ascertain whether there is such a conflict in the evidence as will support the verdict. In this case there was such conflict in the testimony concerning the circumstances under which the will was drawn, and the physical and mental condition of testatrix at that time, as to present a case for the jury to determine

whether there was sufficient mental capacity to direct the making of the will or to assent thereto, and whether the instrument was voluntarily executed.

**Same:** EVIDENCE. Evidence that the proponent and one of the legatees of the will in question directed the room to be cleared that testatrix might make her will was admissible as a circumstance of what took place at the time, and not objectionable as a declaration of a legatee adverse to the interest of other legatees.

**Jurors:** QUALIFICATIONS: DISCRETION. The rule that the court has a large discretion in determining the qualification of jurors applies to will contest cases; and the overruling of an objection to the juror in this case that his testimony showed that in his judgment a testator should divide his property impartially among his heirs was not an abuse of such discretion, where it further appeared from such examination that he had no such special prejudice as would prevent him from being guided by the instructions of the court as to the law.

*Appeal from Clinton District Court.*—HON. A. P. BARKER, Judge.

THURSDAY, MARCH 14, 1912.

IN a proceeding for the probate of the will of Mary Hannaher, deceased, Patrick Hannaher, her only son, named in the will as executor, being the proponent, there was a contest by her daughters on the grounds of want of mental capacity, fraud, and duress. On a trial to a jury there was a verdict for the contestants, and from the judgment, finding that the will proposed for probate was not the last will and testament of the deceased, and ordering that the estate be distributed as intestate property, Patrick Hannaher, as executor and proponent, appeals.— *Affirmed.*

*Wolfe & Wolfe,* for appellant.

*Pascal, Pascal & Pascal* and *P. H. Judge,* for appellees.

McCLAIN, C. J.—The two grounds of contest were: First, that deceased was not at the time of the execution of the instrument of sound and disposing mind, but was then incapacitated to make a valid will; and, second, that the purported will was procured by the fraud, duress, and undue influence of the proponent, Patrick Hannaher. In submitting the case to the jury the trial judge withheld from their consideration any question as to undue influence on the ground that no evidence thereof had been introduced, but submitted to the jury the questions as to mental capacity, fraud and duress. In order to understand the interests of the parties to this contest, it ·may be briefly stated that the testator bequeathed to one daughter $600, to her other daughters $300 each, to her grandson $300, and for masses to be read for her $25, and devised to her son, the proponent, the eighty acre tract of land which she had acquired as her share of her deceased husband's estate, constituting all the land which she owned aside from the town lot devised to one of the daughters, making the legacies above described payable by the son within five years and a charge upon the land, and further appointing said son her sole executor, without bond. The will was signed with a mark and witnessed by R. B. Wolfe, the attorney who drew it, and the Reverend J. J. Nelson, the priest of the parish, of whose church and congregation the deceased was a member.

I. The questions of testamentary capacity and fraud and duress are, under the testimony, necessarily connected with each other, and the insufficiency of the evidence to support a verdict for the contestants as against these objections is relied upon for the appellant. For a reasonable understanding of the merits of this contention it will be necessary, first, to state the facts and conditions surrounding the execution of the will which are without substantial controversy, and then to notice briefly the facts and circumstances relied upon by contestants to establish their grounds of contest. Mrs. Mary Hannaher had been for

some years before her death a widow living at times with one or another of her daughters, but finally, for the last two or three years of her life, was a member of the family of her son Patrick, who had his home on the farm which his mother had acquired as her interest in his father's estate. Patrick was during this time a widower, having six children. Although seventy-one years of age, Mary Hannaher had enjoyed good health until on Sunday, the 19th of December, 1909, when she was stricken with some disease, pronounced by her physician to be an affection of the heart, at the home of her son Patrick, and was at once confined to her bed, where she remained in a comparatively helpless condition, attended by her daughters and neighbors, until her death on the 26th of the same month. On the evening of the 19th the priest, Father Nelson, her physician, Dr. Scanlan, and R. B. Wolfe, a lawyer, visited her on calls by telephone communicated by her son Patrick; the doctor and lawyer coming together, the latter with the understanding that he was to make a will. The priest took the confession of the sick woman; the doctor gave her medicine consisting in part of strychnine intended as a nerve tonic, and gave her a hypodermic injection in the arm; and the lawyer obtained from her, as he testifies, statements of her intentions as to the contents of the proposed will, of which he made memoranda. He says that the sick woman then indicated to him that she did not desire to conclude the execution of her will on that evening, and that he left her with the understanding that he should return the next day. On the morning of the next day the daughters were much concerned about their mother's condition, and through some arrangement which seems to have been made by Patrick, the assistant of the priest (who himself was away on another sick call) appeared and administered extreme unction, a cermony which is usually performed only in view of approaching death, although, as it is testified, it does not necessarily signify a belief in the immediate impendency of

death. Soon after two o'clock in the afternoon of the same day, the priest, the doctor, and the lawyer were at the house, and after the lawyer had been advised by the other two that in their opinion the sick woman was competent to make a will, he proceeded, according to his testimony, to draw up the instrument in question, after further conference with her, writing it in an adjoining room, explaining to her its provisions, and at her request read it to the priest, who was called in to witness it. During the drawing of the will no one was in the sick room besides the testatrix and the lawyer.

In view of the absence of any direct testimony that the son Patrick made any suggestions in regard to the drawing of the will or had any means of knowledge as to how it was being drawn, we should be inclined, were the question of fact left for our determination on the record, to hold that there was a decided preponderance of the evidence against the contestants. There was nothing whatever to show unsoundness of mind, and the sole question was as to whether, when the will was drawn and executed, the testatrix was conscious and able to communicate to the lawyer who drew the will and to the priest who joined with him in witnessing it her wishes; or whether, on the other hand, she was practically unconscious and incapable of expressing her wishes so that the formality was in fact a fraud, and her signature by a cross made with a pen in her hand guided by the hand of the lawyer was in fact duress. There is no evidence to indicate any other fraud and duress than that thus suggested.

But by express statutory provision changing the previous practice of determining contests of this character in a probate proceeding or in equity without a jury, it was expressly provided (Acts 16th Gen. Assem. c. 11) that "whenever the proving of a will is contested, either party shall be entitled to demand a jury and to the verdict of a jury

1. WILLS: contest: verdict: review of evidence on appeal.

on the issues involved." This provision has ever since remained the law of the state with regard to the determination of such contests. See Code, section 3283, which contains a provision to the same general effect. It is not our province, therefore, to pass upon the weight of the evidence but only to ascertain from the record whether there is any conflict in the evidence such as would justify the jury in disbelieving the testimony of the witnesses for proponent and finding that the testatrix was in such mental condition, due to physical weakness and disease, and perhaps also due in part to the administration of medicine, that she was incapable of consciously and rationally forming an intention with regard to the disposition of her property and expressing it to the lawyer who was in attendance to make her will and to the priest who was in attendance to join in the act of witnessing it.

One fact which the jury may have thought of very considerable significance in regard to the intention of the testatrix to make a will is that, so far as appears from the record, she never communicated to any one a desire to do so. Her son Patrick testified that on Sunday afternoon, in the presence of his mother, he spoke of R. B. Wolfe being outside with the doctor, and that she asked him: "Why don't R. B. come in here? I want to see him." But none of the witnesses testified that the sick woman said anything to any one of them about desiring to make a will. The lawyer came on Sunday afternoon in response to a communication indirectly from Patrick suggesting the desire of his mother to make a will and proceeded from that time forth on the assumption that he was present for that purpose. On Monday afternoon, according to the testimony of the lawyer, he did go into the sick room when he first came with the doctor; but as the doctor came out of the sick room and started away, he followed him out to ask whether the sick woman was able to make a will, and was immediately followed by the priest, who also came from the

sick room, who called him back and volunteered the state-
ment that the sick woman was perfectly competent to make
a will.   The priest testified that he did not so act in re-
sponse to any request whatever from the sick woman or any
one else, but that he assumed the lawyer was there to make
a will if the woman was competent to make it, and that it
was the desire of everybody concerned that it should be made.
In relation to this rather important situation, there was the
testimony of one of the daughters that the lawyer was in
fact in the sick room with the doctor and came out with the
statement that the woman was in no condition to do any
business that day and had started away with the doctor,
when the priest called him back and that even then the
daughter protested to him that he had said her mother was
in no condition to make a will.

Although the doctor testified that he found the woman
considerably better on Monday than she had been on Sun-
day evening, the daughters who were in attendance testified
quite in detail and with substantial unanimity that their
mother had a sinking spell toward morning, and that while
she partially recovered from this condition and was easier
for a short time, her condition became so alarming by 7
o'clock that they insisted to their brother that he should
send for or bring the doctor and the priest, and it seems
to have been in response of this urging that the assistant
of the priest was brought to administer extreme unction.
They agreed substantially in their testimony that, before
and immediately after the lawyer was in their mother's
room drawing the will and having it executed, she was in a
condition of stupor, lying immovable in a fixed position in her
bed; and they testified that when the lawyer came into the sick
room where they were, Patrick appeared at the door and
stated that the room must be cleared, as their mother was
going to make her will.

We think it sufficient to say, without further elabora-
tion of the details of the evidence, that there was such con-

flict in the testimony as to the circumstances under which the will was drawn and the physical and mental condition of the testatrix at that very time, to present a case for the determination of the jury as to whether the instrument purporting to be a will was actually directed to be made and assented to and voluntarily signed by the testatrix. We ought in fairness to notice the fact that the witnesses supporting the contest were interested parties, while, aside from the proponent, the witnesses in his behalf were not directly interested in the result of the contest, and that at least one witness for proponent, a neighbor, testified quite circumspectly as to facts of her observation tending to show that not only about the time the will was executed, but down to the day before her death, the testatrix was mentally alert and in a much better physical condition than the testimony of contestants would indicate, and in this she was corroborated by the testimony of Patrick. This neighbor also testified quite circumspectly as to previous declarations made to her by the testatrix as to her intention to make a will corresponding in its provisions to those which were afterwards incorporated into the instrument. But her cross-examination may have tended very materially to weaken in the minds of the jurors the creditability of her recollections. On this branch of the case we need do no more, therefore, than to express our conclusion that there was such conflict in the testimony as to justify the jury in finding that testatrix was incapable of making a will and that her signature was not her voluntary and conscious act.

The numerous assignments of error in the giving of instructions raise no other question than the sufficiency of the evidence to justify a submission to the jury of the issues as to competency, fraud, and duress. As they have not been specifically argued, we need not give them further attention.

II. Some rulings on the admissibility of evidence are questioned, but on an examination of the record we are

unable to discover that there was any error or, if error,

2. SAME: evidence.

that there was any possible prejudice. The testimony of one of the contestants that Patrick directed the room to be cleared in order that his mother might make her will was objected to on the ground that it related to a declaration of one of the legatees adverse to the interests of the other legatees, and therefore, while it might have been admissible had he been the sole legatee as a declaration against interest, it was not admissible in view of the fact that others would be thereby prejudically affected. We have no occasion to discuss the question of law involved. The statement of Patrick was not in any sense such declaration. It was, if made, simply a circumstance explanatory of what was in fact done tending to throw light upon the conditions under which the instrument was prepared and executed.

III. The overruling by the court of challenges for cause, interposed as to two jurors on the ground that they admitted a prejudice against sustaining a will that did

3. JURORS: qualifications: discretion.

not make an equal division of property among the heirs, is also a ground of alleged error. The only statutory ground of challenge which this objection tended to sustain was that it showed "such a state of mind as will preclude him (the juror) from rendering a true verdict." Code, section 3688. But we have often held that in determining the competency of jurors the court is vested with a large discretion which will not be interfered with except on a showing of clear abuse. *Dale v. Colfax Consol. Coal Co.,* 131 Iowa, 67; *Croft v. Chicago, R. I. & P. R. Co.,* 134 Iowa, 411. This rule has been applied as to the qualification of jurors in a will contest where substantially the same objection as that now interposed was made. *In re Estate of Goldthorp,* 115 Iowa, 430. The record shows that the two jurors whose competency was challenged stated on *voir dire* that in their judgment a testator should divide his property impartially

among his heirs; but, in response to questions by the judge, they stated that they had no such special prejudice as would prevent them from being guided by instructions of the court as to the law. The notion that these jurors had some persistent prejudice against allowing the owner of property to dispose of it as he might see fit by will was apparently manufactured by skillful questions propounded by counsel, rather than the result of any settled conviction entertained by the jurors themselves. We are satisfied that the rulings complained of in this respect were not erroneous.

Finding no error in the record, the judgment is *affirmed.*