STATE OF IOWA, Appellee, v. EVERETT BURZETTE, Appellant.

No. 38972.

DECEMBER 14, 1928.

REHEARING DENIED JUNE 24, 1929.

*F. A. Ontjes, W. G. Henke,* and *Henry Curvo,* for appellant.

*John Fletcher,* Attorney-general, *Neill Garrett,* Assistant Attorney-general, *Roe P. Thompson, John A. Senneff,* and *William P. Butler,* for appellee.

EVANS, J.—Morris Van Note, a subdirector of his school district, was, on the night of March 13, 1926, shot and killed, upon the schoolhouse grounds of his district. The date was Saturday. It appears that, three weeks prior to this date, some-

one had broken into and entered the schoolhouse, and had removed therefrom the window curtains and their fixtures. Because of this fact, the deceased had been giving special attention to guarding the schoolhouse at week ends against further depredation. He left his home, a mile away from the schoolhouse, sometime after dark, and was not again seen alive. At about midnight, the dead body was found upon the schoolhouse ground. An examination of the premises disclosed that the schoolhouse had been broken into, and that an oil stove used therein for cooking purposes at noontime had been removed therefrom, and had been carried out upon the schoolhouse grounds and abandoned there. Three exploded shells were found in close proximity to each other, indicating that a gun had been discharged at or about the place where the shells were discovered. An abandoned shotgun was found upon the ground near by, but no shells had been discharged therefrom. The abandoned shotgun furnished the first clue to the defendant's connection with the killing. It was learned that the gun belonged to him.

The defendant was a single man, forty years of age, who lived in a rented shack in the outskirts of the town of Clear Lake. The schoolhouse where the shooting had occurred, was four miles northwest of Mason City, and was distant from the defendant's shack approximately 13 miles. The defendant was sought at his shack, but was not found there. He had fled during the night. A search of the shack was made, and there were found therein the window curtains and the fixtures that had been taken from the schoolhouse three weeks before. This defendant's parents lived in Clear Lake, and he himself had been reared in and about that town. He usually took his meals at the home of his parents. Since about March 1st, a cousin, Melvin Burzette, formerly residing with his parents at Rudd, in Floyd County, took up his abode with the defendant in the shack. He was 22 years of age. Both of them left Clear Lake in an automobile on the night of the shooting, leaving no word to indicate their destination or their whereabouts. A few weeks later, they were arrested in Tulsa, Oklahoma, and were brought to Mason City. Both were charged with the killing. Melvin Burzette confessed his connection with the affair, and was used by the State as its witness in this prosecution against this de-

fendant. The story of Melvin, which was accepted by the jury, was, in substance, the following:

At about 7 or 8 o'clock on the evening in question, the defendant proposed to go out driving, and asked Melvin to go along. They drove to Mason City, and from there to the schoolhouse in question. Melvin testified that he himself was ignorant of the purpose of the trip. The schoolhouse was on the west side of à north and south highway. The parties stopped their automobile on the west side of this highway, facing south. The defendant had placed in the automobile two shotguns. One was an ordinary short shotgun; the other is described as a Marlin Repeating shotgun. It is also described as a pump gun, so constructed that the same action which discharges an exploded shell puts a new one in place. When they got to the schoolhouse, Everett advised Melvin that there was an oil stove in the schoolhouse, which he was about to take. He produced a wrench, with which he broke the lock. He furnished Melvin with a flash light, and directed him to go inside and bring out the oil stove, while the defendant would stand guard with his Repeating Marlin shotgun. This was the course pursued. Melvin carried the stove outdoors, and within two or three feet of the car. This was at a point southeasterly from the southeast corner of the schoolhouse. At this stage, Van Note came, and was somewhere in the neighborhood of the northeast corner of the schoolhouse. He had a Colt revolver. He shouted and shot. As a result, Melvin received a flesh wound. He ran to cover behind the woodshed, a short distance west of him. A fusillade of shots followed from revolver and shotgun, being approximately four in number from each one. The defendant called Melvin from his hiding place. At this point, his testimony was as follows:

"After I came from back of the woodshed, we left,—didn't stay there very long. As we drove down the road, Everett said, 'I think I got him.' He told me to keep my 'damn mouth shut.' Everett is a great deal larger man than I am. He said something about receiving a wound, when we were on our way to Clear Lake. He said he got hit in the left hand."

When the parties first arrived at the schoolhouse, both guns were taken out of the automobile. The short shotgun was left at the automobile, with its butt upon the ground, and its upper

end resting on the right rear fender. In the hurry of the get-away, it was not picked up, nor was the oil stove carried away. The two men drove back to the shack at Clear Lake, and equipped themselves from the shack with some conveniences, and drove away into the night. They drove west and north, up through Minnesota and to South Dakota and Wyoming, and back again to Spearfish, South Dakota, and from there south to and through Nebraska and Kansas and into Oklahoma, where the flight came to its end by their arrest. Their automobile had broken down at Sundance, Wyoming. This was the occasion of their working back into Dakota and south. At this stage, they were traveling under difficulties,—sometimes walking, sometimes boarding freight trains, and sometimes being taken by accommodating automobilists. At Hastings, Nebraska, they stole an automobile, which they used in their traveling from that point, and which was in their possession when they were arrested at Tulsa.

The case was twice tried in the district court, the first trial resulting in a disagreement of the jury. The defendant became a witness at each trial. He testified that he was not at the schoolhouse at all, and had nothing whatever to do with the killing; that Melvin took the car and drove out that night, and came back later, wounded; that he represented himself as having been wounded in a fight with some boys. The defendant's explanation of the flight was that he had gone with Melvin at his request, and because he himself also had intended to go to Portland. He denied any connection with the stealing of the automobile at Hastings, and testified that he separated from Melvin at Grand Island, Nebraska, and afterwards met him by mere accident in the city of Wichita; that at that time Melvin had the stolen automobile, which he claimed he bought and paid for by wiring for money from home. The verdict of the jury indicates that the jury disbelieved the story of the defendant. It carried great improbabilities in its first recital. It put the defendant to a special disadvantage that he had to recite the story a second time. It so happened that, at points between Grand Island and Hastings, there were two farm homes where, on different dates, the two wanderers, looking for work, had been kindly received and harbored and fed. Melvin pointed out these places to the state officials, and witnesses were brought from these homes, who testified at the second trial. This tes-

timony made it necessary for the defendant to testify at the second trial that, after they had left Grand Island, and had traveled a long distance in the direction of Hastings, they went back to Grand Island, though for no apparent purpose. This is a sufficient indication of the nature of the conflict of evidence between these two persons. For the purpose of our consideration of the appeal, we shall have little occasion to deal with this conflict. It was required that the testimony of Melvin, as an alleged accomplice, be corroborated, in order to sustain the conviction.

The record in the case is very voluminous, and the briefs are very extensive. The appellant assigns 112 errors. These, with their supporting brief points, cover 112 printed pages. Manifestly, it will be impracticable for us to deal with these in detail.

I. The first error assigned is upon the order of the court overruling a challenge to the juror Majors. This juror had read newspaper accounts of the former trial. He testified to having  formed an opinion, based upon the newspaper reports. He was examined and re-examined repeatedly by each side, respectively, and was likewise examined by the judge. Though the result of his examination by defense counsel and the result thereof by counsel for the State and the judge appear contradictory, it is not so difficult for the experienced observer from the bench to see the consistency of the juror's answers. In response to the examination of defense counsel, the juror said he had such an opinion as would require evidence to remove. The state of mind thus described is incorporated in the question. It is a *stock* question, and is too hoary to be condemned. It must be said, nevertheless, that it serves little function in ascertaining the real state of mind of a juror. The question calls for an affirmative answer, and always receives one. The problem is then laid upon the juror to harmonize such answer with other answers to the effect that he can lay his opinion aside and render a verdict upon the evidence and the instructions, uninfluenced by such opinion. The skill of counsel in such a dialogue is usually superior to that of the juror, and this fact is not to be ignored by the court in determining the qualification of a juror. This juror answered repeatedly that he could lay aside the opinion he formed, and that he could try the case upon the evidence and the instructions, without regard to such opin-

824

ion. We think the examination as a whole brought the question fairly within the discretion of the trial judge, and within the rule which we have heretofore laid down in many of our prior cases.

In support of his exception, the defendant cites, among other authorities, *State v. Teale,* 154 Iowa 677, wherein we used the following language (682):

"We are constrained to say in this connection, however, that we see no occasion in the ordinary administration of the criminal law in this state for the close rulings on the qualifications of jurors that are constantly brought to our attention. Although a ruling may be technically right, if it must be so doubtful as to raise a fair question as to its correctness, it is far better to give the accused the benefit of the doubt, to the end that he and all other men may be satisfied that his rights have not been invaded. Confidence in the fairness and impartiality of each member of a jury which shall be sworn to try a man on a charge involving his life or liberty, is of the greatest importance to the welfare of the state. Indeed, it is of such paramount importance to every citizen that the time and expense necessary to secure jurors as to whom no doubt may rightly exist, is an insignificant consideration."

We later approved this language in *State v. Powers,* 181 Iowa 452, 459. We still approve it herein. That the question presented was fairly within the discretion of the trial court was held in *State v. Ralston,* 139 Iowa 44; *State v. Hassan,* 149 Iowa 518; *Moore v. Fryman,* 154 Iowa 534; *In re Will of Hannaher,* 155 Iowa 73; *State v. Williams,* 197 Iowa 813.

II. The State introduced evidence of the search of the defendant's shack and the finding therein of the window curtains and fixtures which had been taken from the schoolhouse. This  evidence was received over appropriate objections by the defendant, and error is now assigned on the ruling. The contention is that this evidence served no material function in the case, and that its only effect was to permit the State to prove the commission of another crime. The evidence was not offered for the purpose of proving another crime. If the facts proved had a material bearing upon the issues in the case, they were admissible

in evidence; and this would be true regardless of whether they constituted a crime or not. Were the facts pertinent? Melvin had testified that the defendant told him that there was an oil stove in the schoolhouse, and directed him to bring it out. Melvin being an alleged accomplice, the burden was on the State to corroborate his evidence. It was permissible, therefore, to the State to introduce any evidence which tended to corroborate Melvin in any material part of his testimony. The testimony of Melvin tended to show that the defendant already knew, before the perpetration of the burglary, that there was an oil stove in that schoolhouse. That testimony, standing alone, was subject to attacking argument on the ground of its improbability. The defendant lived 13 miles distant from the schoolhouse, and, so far as otherwise appears, was not acquainted with the neighborhood. The fact, therefore, that the curtains taken from the schoolhouse three weeks before were found in the defendant's shack was a circumstance which strongly fortified the testimony of Melvin at this point. The State was dependent wholly upon circumstantial evidence for its corroboration of the testimony of Melvin. This was clearly a circumstance tending to such corroboration.

III. The case was tried on the theory that the defendant was engaged in committing a felony at the time of the shooting. Upon this contention the defendant assigns error. His contention is that a *schoolhouse* is not comprehended  within the terms of Section 13001, Code of 1924, which provides as follows:

"13001. *Other breakings and enterings.* If any person, with intent to commit any public offense, in the daytime break and enter, or in the nighttime enter without breaking, any dwelling house; or at any time break and enter any office, shop, store, warehouse, railroad car, boat, or vessel, or any building in which any goods, merchandise, or valuable things are kept for use, sale, or deposit, he shall be imprisoned in the penitentiary not more than ten years, or be fined not exceeding one hundred dollars and imprisoned in the county jail not more than one year."

The contention of the State is that the schoolhouse was a "building," and that it was a building in which an oil stove was kept for use. The oil stove had value, as appears from the

testimony on both sides. It was not necessary that such value should be large, rather than small. Its value, though small, was substantial, rather than nominal. We think the schoolhouse in question came clearly within the terms of our statute. We have never held otherwise. We think that such construction of the statute requires no further discussion in its support.

IV. At the close of all the evidence, the defendant moved for a directed verdict on the ground of the insufficiency of the evidence to sustain a conviction. The deficiencies of the evidence were set forth in various specifications of the  motion. Error is assigned upon the overruling of such motion, and argument is directed here in support of the various grounds of the motion. It is first contended that the evidence for the State shows that the defendant acted in lawful self-defense; that, in legal effect, Van Note assaulted the defendant with a deadly weapon; that he did not observe the requirements of the law in the making of an orderly arrest; that he gave no indication that he was trying to make an orderly arrest.

Melvin Burzette testified, on cross-examination, that, when the first shot was fired by Van Note, he (Melvin) called out, "Don't shoot;" that he held up his hands; and that he ran for the woodshed. He testified likewise that something similar was shouted by this defendant, and that he held up his hand, with the gun therein. This is the evidence which counsel for defendant rely on as conclusive proof of a lawful self-defense.

The argument is that the burden was upon the State to prove that the killing was not done in lawful self-defense; and that, if it fails to so prove, then there was no *corpus delicti* proved, and no one could be found guilty. The argument assumes that Van Note was an aggressor, and that the defendant was a peaceable citizen, in lawful occupation of the ground on which he stood. If the felony had become a past event, and if thereafter the defendant had returned to the lawful walks of his life and to his surroundings, and if his arrest were attempted under such circumstances, the method thereof should, under the law, be a formal and orderly one. Does it follow that the failure of such formality under the circumstances appearing in this record gave to the defendant the right to kill in self-defense? The defendant was engaged in the commission of a felony. In

legal contemplation, he was thereby the aggressor. Under Section 12922, the deceased had a right to resist, by force, the commission of such felony and the taking of his property. The defendant was armed with a deadly weapon. He stood guard over his accomplice, who entered the building, with his gun loaded and ready for discharge. His attitude clearly indicated the purpose not to submit peaceably to lawful arrest. In resistance to the felony, the deceased had a right to meet force with force, and to interpose deadly weapon against deadly weapon. It avails little to the defendant to argue that the deceased had no right to kill him. That question could only arise if the deceased had killed him, and was being prosecuted therefor. Such are the cases upon which defendant relies at this point. That the owner of property may resist with a deadly weapon the felonious taking or breaking thereof, and that he may be justified in inflicting great bodily injury with such weapon, if it is reasonably necessary to the protection of his property, was our holding in *State v. Metcalfe*, 203 Iowa 155. The effect of such holding is to make the perpetrator of a felony the aggressor, where he encounters resistance to the perpetration of his crime. The defendant herein prepared himself in advance with a deadly weapon, for the very purpose of shooting down resistance. If a property owner, in such a case, must, as a matter of law, lay down his weapon and pursue the formulas of peace, then his life has been forfeited in advance. No burglar could fear such a resistance. Not only was he not bound to follow the formulas of an arrest; he was not bound to make or attempt an arrest at all. He was legally authorized to *resist*. The burglar had the legal right to abandon his purpose and to retreat. If the deceased had inflicted injury upon him in such retreat, a different question would be presented. Such is the question that is largely argued in defendant's brief. The defendant could have retreated, as did Melvin. He did not do so. He asserted his power over the fruits of his felony with his deadly weapon. If the deceased should be deemed to have been attempting an arrest, then the defendant must be deemed to have been resisting such arrest, and to have prepared for it from the very beginning by the use of a shotgun. *State v. Horner*, 139 N. C. 603 (52 S. E. 136); *State v. Taylor*, 70 Vt. 1 (39 Atl. 447); *Miller v. State*, 31 Tex. Cr. 609 (21 S. W. 925); *Brooks v. Commonwealth*, 61 Pa. St. 352 (100 Am. Dec.

645) ; *State v. Evans,* 161 Mo. 95 (61 S. W. 590) ; *State v. Albright,* 144 Mo. 638 (46 S. W. 620).

What we have said up to this point is predicated upon the assumption that the jury was bound to accept the testimony of Melvin, as the State's witness, as being wholly true. We now add that the jury was not bound to accept such evidence as true, even though Melvin was a witness for the State. The argument for the defendant at this point is that the evidence was binding upon the State. It was so binding only in the sense that the State could not impeach the witness. It could contradict his testimony, and the jury could accept his testimony in part and reject it in part. Upon the whole record, the jury would have been justified in finding from all the circumstances that the defendant was prepared for quick work in case of apprehension, and that his shooting was prompt, and without any attempt or purpose to retreat or to surrender. While the burden was upon the State to prove that the killing was not done in self-defense, it was not required to make such proof by direct evidence. Every element of the case might have been proved by circumstantial evidence. In this case, the killing was proved by direct evidence. The circumstances attending the killing are very persuasive that it was not done in lawful self-defense. The fact that it was done while in the perpetration of a felony is, of itself, a very significant circumstance on that issue.

We do not overlook in this connection that it is contended by the defendant that, at the time of the killing, the defendant was not engaged in the perpetration of the burglary, and that the larceny was, at best, a mere misdemeanor. If this contention were conceded, still it would not meet the provision of Section 12922, which would permit the deceased to resist by force the taking of his property. But the contention cannot be conceded. In legal contemplation, the burglary, though complete, was a present, and not a past, event. True, it was fully accomplished. So far as the commission of the offense was concerned, it was complete when the lock was broken and the door was opened for the entry. If the defendant had been then and there apprehended, while in the building, then, according to defendant's contention, he would not have been taken in the burglary, because the crime was fully committed. In defining murder in the first degree, Section 12911 provides that murder perpetrated in the perpetra-

tion of burglary is murder in the first degree. If an offender should break and enter a house and should therein murder its occupant, would he be guilty of murder in the perpetration of a burglary? According to the contention of the defendant, he would not, because the burglary would necessarily be complete before the burglar could find his victim within. What is meant by *murder in the perpetration of a burglary* is a murder resulting as an incident to the burglary, and associated with the burglary as one of its hazards. In this case, the jury rendered a verdict of guilty of murder in the second degree only. He has, therefore, no ground of complaint at this point.

V. There is another feature of the record which, to our minds, is quite conclusive against the defendant on the question of self-defense. The defendant became a witness in his own behalf. He testified that he was not at the scene of the murder, and had nothing to do with it. The jury, by its verdict, necessarily found that the testimony of the defendant in that regard was false. If false, it was deliberately so. He staked his defense upon a falsehood. Having voluntarily become a witness in his own behalf, he subjected himself to the same rules of evidence that apply to any other litigant who becomes a witness in his own behalf. If he retreated, or did any other act which indicated to the deceased submission and surrender on his part, he knew what it was. He refrained from testifying on that subject. The jury was, therefore, warranted in drawing unfavorable inferences against him on such question, by reason of such failure.

VI. Defendant's motion to direct also raised the question of the sufficiency of the evidence as a whole to sustain the conviction. It is properly argued that the State's principal witness was an accomplice, and that the statute requires  corroboration of his evidence. The corroboration of Melvin consists of circumstances. To our minds they are very persuasive. The parties traveled under false names. They changed the numbers of their automobile. They had provided false numbers before starting on their flight, and carried them with them until they got into Minnesota, where they made the change. The explanation made by the defendant is that he went at the request of Melvin, and that he had had a purpose to go to Portland. The jury was justified in disbelieving this explanation. We think that the flight, with

all the other circumstances, is sufficient corroboration of the testimony of Melvin to justify its acceptance by the jury. *State v. Harding,* 204 Iowa 1135, 1149. We have read this record carefully, and we think that no disinterested person could read it and yet have any reasonable doubt of the guilt of the defendant.

As already indicated, the record before us is very voluminous. Error has been assigned upon substantially every ruling of the court on the evidence, and upon each instruction. The limits of an opinion will not permit our discussion of these errors seriatim. We deem the questions considered in the foregoing divisions the more important ones presented by the brief. We have read the complete record upon which other assignments of error are predicated, and find no error which would justify a reversal of the judgment. In our judgment, the record discloses a fair trial. Under the evidence, the conviction of the defendant was inevitable.

VII. Errors are assigned upon the giving of Instructions 6, 8, 12, 13, 15½, 18, 20, 21, 22, 23, 24, 27, 28, and 29. The law involved and the contention of the defendant in these assignments are largely covered by what we have said  in the foregoing pages. The instructions complained of are in harmony with the views herein expressed. Complaint is made of imperfect definitions in many of such instructions. We have read them carefully, and find no error therein. The rights of the defendant were very carefully guarded therein. In some respects, some of the instructions gave a statement of the law more favorable to the defendant than he was legally entitled to.

VIII. Error is assigned upon alleged misconduct of counsel in the closing argument to the jury. The closing argument for the State was taken down by the reporter, at the request of the defendant. It appears from a reading of the argument that it was not wholly confined to the record, and that it was subject to complaint on that ground. The contention for the State is that it was strictly responsive to the argument of counsel for defense. No other argument was preserved of record. It appears, however, that the trial judge was present during all the arguments and heard them all. In ruling upon this complaint, he entered of record his finding that the portions of the closing argument complained of were justified by, and responsive to, argument by

counsel for defense. This finding by the trial court is quite decisive on this point.

The foregoing discussion covers the points to which the stress of argument has been directed.

The argument for the defendant is very thorough and comprehensive, and is directed to details so numerous as to render it impracticable for us to deal with them seriatim, within the proper limits of an opinion. A careful study of the whole record satisfies us that no proper ground of reversal is presented therein.

The judgment below is, accordingly,—*Affirmed.*

All the justices concur.