# IN THE COURT OF APPEALS OF IOWA

No. 18-1253
Filed April 15, 2020

**ALBERT WAYNE WARE,**
  Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
  Respondent-Appellee.
_____

Appeal from the Iowa District Court for Scott County, Marlita A. Greve, Judge.

Albert Ware appeals the district court's denial of his application for postconviction relief. **AFFIRMED.**

Lauren M. Phelps, Hudson, Florida, and Thomas J. O'Flaherty (until withdrawal), Bettendorf, for appellant.

Thomas J. Miller, Attorney General, and Israel Kodiaga, Assistant Attorney General, for appellee State.

Considered by Bower, C.J., and Vaitheswaran and Doyle, JJ.

**VAITHESWARAN, Judge.**

A jury found Albert Ware guilty of first-degree murder and first-degree robbery in connection with the theft of money and a shooting that occurred in Davenport in 1981. The Iowa Supreme Court affirmed his judgment and sentence. *See State v. Ware*, 338 N.W.2d 707, 709 (Iowa 1983). This appeal is from the district court's denial of Ware's second application for postconviction relief.

Ware's application was premised on a report commissioned by the Federal Bureau of Investigation which, according to Ware, "show[ed] that [the State expert's] methodology, conclusions and expert testimony were scientifically flawed and wholly unreliable." Ware eventually filed a motion for summary disposition. He attached a letter from the FBI to the county attorney addressing the expert's testimony in his case. The letter stated:

> After reviewing the testimony of the FBI's examiner, it is the opinion of the Federal Bureau of Investigation Laboratory that the examiner stated or implied that the evidentiary specimen(s) could be associated to a single box of ammunition. This type of testimony exceeds the limits of the science and cannot be supported by the FBI.

Ware asserted "the Government agent's false testimony was a violation of [his] fundamental right to due process guaranteed by the state and federal constitutions, and . . . [he] must be afforded a new trial." The district court denied the summary-disposition motion. The court reasoned that "exclusion of [the expert's] testimony at a new trial probably would not change the original guilty verdict."

After several years, the parties agreed to submit the postconviction-relief application for disposition on the briefs. The court denied the application.

On appeal, Ware argues, "The unreliable scientific FBI testimony, now eliminated from evidence, was central to the prosecution's case, and its taint undermined [his] fair trial rights." He also contends, "The corroborative evidence, offered to support the scientific FBI testimony and relied upon by the PCR court, falls short of proving [he] possessed the fatal bullet shortly before [a man] was shot to death."

The State responds that Ware "never raised" an unfair-trial issue and "[n]othing in the postconviction ruling discussed Ware's current claim on appeal alleging a violation of his due process and fair trial rights under article I, section 10 of the Iowa Constitution, and the Sixth Amendment to the United States Constitution." Accordingly, the State asserts, Ware "failed to preserve error" on the constitutional claim. We agree.

In *State v. Derby*, 800 N.W.2d 52, 60 (Iowa 2011), the supreme court reaffirmed that "[i]ssues not raised before the district court, including constitutional issues, cannot be raised for the first time on appeal." (citation omitted). The court concluded the defendant failed to preserve error on a claim that he was denied "his constitutional right to a fair trial." *Derby*, 800 N.W.2d at 60.

In this case, Ware raised a due process claim in his motion for summary disposition, but he did not pursue the claim. His brief in support of postconviction relief focused exclusively on whether, in the context of a newly-discovered-evidence claim, "the verdict [would] probably be different" after "the cloud that [the expert] cast over this case is removed." That question is distinct from a due process challenge. *See More v. State*, 880 N.W.2d 487, 499 (Iowa 2016) (citing and separately considering (1) a newly-discovered-evidence claim based on the

same flawed evidence that is at issue here and (2) a claim that the flawed evidence deprived the defendant of due process).  Error was not preserved on the due process issue and we will only consider the newly-discovered-evidence claim.[1] Our review is for errors of law.  *See id.* at 498.

> An applicant seeking relief based on newly discovered evidence must show:
>
> (1) that the evidence was discovered after the verdict; (2) that it could not have been discovered earlier in the exercise of due diligence; (3) that the evidence is material to the issues in the case and not merely cumulative or impeaching; and (4) that the evidence probably would have changed the result of the trial.

*Id.* at 499 (citation omitted).  As mentioned, the only contested element was the final one: whether the newly discovered evidence in the form of the FBI letter "probably would have changed the result of the trial."[2]

"The standard for whether the evidence probably would have changed the result of the trial is a high one because of the interest in bringing finality to criminal litigation."  *Id.*  "[T]his is not a harmless error standard, or even the kind of prejudice associated in federal courts with ineffective assistance of counsel."  *Id.* at 510.  "Instead, the inquiry is whether, based upon all the evidence, the verdict probably would have been different in the case before us."  *Id.*

The postconviction court concluded "exclusion of [the expert's] testimony at a new trial would not change the original guilty verdict."  The court reasoned that "[t]he body of circumstantial evidence here is significant and sufficient so that a

---

[1] Ware also alludes to prosecutorial misconduct.  That issue was not preserved for our review.

[2] In asking us to affirm the court's ruling, the State cites a letter Ware wrote to the court.  We decline to consider the letter because it was not "evidence."  *Id.*

reasonable juror could have found proof beyond a reasonable doubt that" Ware

committed the murder "without the [expert] evidence and testimony."

On direct appeal, the supreme court summarized that body of evidence as

follows:

> Eugene Tappa, the victim of the crime, was the proprietor of the Sports Page Lounge in Davenport. According to the testimony of the accomplice Dennis Williamson (Williamson), Albert [Ware], [his brother] Daniel, and Williamson knew that Tappa routinely brought a large amount of cash to his bar on Thursday nights to cash payroll checks. The three first planned to steal the money from the trunk of Tappa's car while he was visiting at his girlfriend's house. Daniel phoned the lounge and was told Tappa had not arrived, indicating to the three that his car would be at his girlfriend's house. The three went to the girlfriend's house, found Tappa's car, and Williamson used a coat hanger to enter the front seat of the car. Williamson tried to "hot-wire" the trunk release mechanism inside the glove compartment of the car but was unsuccessful. The three left the car and returned to Daniel's place of business where Daniel again phoned the lounge. Learning that Tappa would arrive within a half hour, the three then decided to rob him in the lounge parking lot. [Ware] and Williamson were to accost Tappa while Daniel was to wait in the getaway truck parked nearby. All were armed, Williamson with a .25 caliber weapon and [Ware] and Daniel with .38 caliber handguns.
>
> Williamson testified that when Tappa arrived at the parking lot, [Ware] ran to the car, put his handgun to Tappa's stomach, and told Williamson to grab the money. Williamson took the money bag from Tappa and ran down the alley. He became frightened, however, when he heard a "pop" which sounded like [Ware's] gun, so he did not stop at Daniel's truck but instead ran with the money bag through alleys to Daniel's auto repair shop. When [Ware] and Daniel returned, the three counted and divided the money. Williamson further testified that [Ware] told him at that time that he shot Tappa although "he didn't mean to."

*Ware*, 338 N.W.2d at 709–10. The supreme court found Williamson's accomplice

testimony was sufficiently corroborated by "other evidence which shall tend to

connect the defendant with the commission of the offense," as required by Iowa Rule of Criminal Procedure 2.21(3). *Id.* at 710.[3] The court stated:

> Here, the independent evidence concerning the glove box and phone calls by Daniel to the lounge do tend to bolster the credibility of the accomplice Williamson. The critical corroborative testimony connecting Albert to the crime, however, is that concerning bullets he received from [an acquaintance].
>     [The acquaintance], David Ogburn, . . . testified that several weeks before Tappa was shot, Ogburn had given [Ware] twelve .38 caliber wadcutter bullets which belonged to Ogburn's father. Chemical analysis of the wadcutter bullet removed from Tappa's body and bullets received from Ogburn's father showed that they had the same elemental composition.

*Id.* at 710–11. The court also relied on the since discredited expert evidence, finding "that the evidence tending to connect [Ware] with wadcutter bullets just like the one found in Tappa's body sufficiently corroborated Williamson's testimony." *Id.* at 711.

Ware challenges the strength of the bullet-related evidence in the record, absent expert testimony connecting it to the crime. He cites a claimed inconsistency between the testimony of an officer who identified the brand of the fatal bullet and the testimony of David Ogburn's father, who stated the bullets stolen from him were in a box with a different manufacturer's name. In his view, "The jury could have only squared the police identity of the bullet manufacturer, with the contrary evidence of [Ogburn's father], by preferring [the expert's] scientific testimony that the fatal bullet was from the same batch of lead, at the same time and place as [the father's] bullets."

---

[3] The rule was then numbered Iowa Rule of Criminal Procedure 20(3).

To the contrary, the jury could have considered the admission of Ogburn's father that he had no knowledge whether the bullets in his box of ammunition were manufactured by the company whose label appeared on the outer sleeve. He agreed "[t]hey could have been anything simply stuck in there." His testimony together with his son's testimony that he stole the bullets and gave them to Ware, were sufficient to support a jury finding concerning the origin of the deadly bullet, even without the discredited expert testimony.

As noted, Ware also challenges the corroborative evidence. The heading of his argument refers to corroborative evidence "offered to support the scientific FBI testimony," but the body of his argument refers to the evidence "to corroborate" the accomplice testimony of Williamson. Specifically, Ware (1) points to Williamson's "incentives and motivations to lie"; (2) asserts "Williamson's testimony about breaking into Tappa's car to open the glovebox is nothing he could not have done alone" and "nothing other than Williamson's testimony "puts him in the vicinity of Williamson's automotive burglary"; (3) states Williamson's testimony that he (Ware) called the lounge to determine Tappa's whereabouts was unsupported by any other evidence; and (4) asserts Williamson was "a chronic alcoholic and intoxicated at the time of the crime."

None of these points implicate the State's use of the discredited FBI testimony to corroborate Williamson's testimony. We have declined to "reconsider whether there was sufficient corroborating evidence for the jurors to rely on [accomplice] testimony" where "the corroborating evidence was not affected by" the newly discovered evidence. *See Wright v. State*, No. 15-1530, 2017 WL 936077, at *8 (Iowa Ct. App. Mar. 8, 2017). That said, the newly discovered

evidence in *Wright* was the claimed recantation of an accomplice who previously implicated the defendant. *Id.* at *4. Here, the newly discovered evidence removes a piece of corroborating evidence. Because the removal of that evidence implicates the sufficiency of the remaining corroborating evidence, we will address Ware's four challenges to the corroborating evidence.

The first and fourth points Ware raises go to Williamson's credibility rather than the sufficiency of the corroborating evidence. The postconviction court acknowledged Williamson had significant motivations to lie and consumed large quantities of alcohol. Nonetheless, the court found "ample and sufficient corroboration of" his testimony. We agree with the postconviction court that, irrespective of Williamson's credibility, the focus must be on the corroborative evidence.

Ware's second and third points relate to that evidence and specifically to the claimed absence of corroboration for Williamson's glovebox and phone call testimony. The supreme court found evidence to corroborate both points. The court's decision on this point is conclusive. However, even if we were to find that those pieces of evidence alone are not sufficiently corroborative of Williamson's testimony in the absence of the discredited FBI testimony, the record contains additional corroborative evidence.

Williamson testified Ware ran up to Tappa's car with his gun out, "put the gun to Tappa's body"—specifically to "his stomach," and shot Tappa. Ware himself partially corroborated this testimony. *See State v. Martin*, 274 N.W.2d 348, 349 (Iowa 1979) ("Defendant's testimony alone probably would have been sufficient to satisfy the rule."). He testified at trial and placed himself in the company of his co-

defendant brother for most of the day. *See State v. Blain*, 92 N.W. 650, 650 (Iowa 1902) (noting defendant was "in the company of his codefendants"). He also testified he went to Florida for vacation in the month of the shooting. *See State v. Burzette*, 222 N.W. 394, 399 (Iowa 1928) ("We think that the flight, with all the other circumstances, is sufficient corroboration of the testimony of Melvin to justify its acceptance by the jury."). Additionally, as discussed, Ogburn testified to stealing bullets from his father and giving them to Ware, and Ogburn's father confirmed the theft. Finally, FBI special agent Paul Schrecker testified that holes in the shirt and jacket previously identified as having been worn by Tappa were surrounded by particles of gunpowder residue, leading him to conclude "the muzzle of a weapon [was] in direct contact with the garment[,] . . . as a far away as a couple of inches." *See State v. Schroeder*, No. 16-1786, 2018 WL 2230542, at *10 (Iowa Ct. App. May 16, 2018) (citing and approving State's assertion that "blood spatter and gunshot residue evidence" corroborated accomplice testimony). Schrecker also compared the fired bullet to the five unused bullets that came from Ogburn's father and determined "the fired bullet" had "the same . . . physical characteristics" as the others. We conclude the postconviction court did not err in finding sufficient evidence to corroborate Williamson's testimony after setting aside the discredited evidence and in concluding the absence of the discredited evidence probably would not have changed the result.

We affirm the denial of Ware's postconviction-relief application.

**AFFIRMED.**