**UNITED STATES v. SPRENGEL, and four other cases.**
Nos. 6528–6533.

Circuit Court of Appeals, Third Circuit.
April 3, 1939.

Arnold M. Replogle and Robert M. Ewing, both of Pittsburgh, Pa., for appellants.

Benjamin M. Parker, of Washington, D. C., Charles F. Uhl, U. S. Atty., of Pittsburgh, Pa., Thomas W. Lanigan, Sp. Asst. Dist. Atty., and Arthur Breuer, Atty., Department of Justice, of Washington, D. C., for the United States.

Before BUFFINGTON and BIGGS, Circuit Judges, and DICKINSON, District Judge.

BIGGS, Circuit Judge.

The appellants, with others, were indicted, tried and convicted upon charges of using the United States mails to defraud and with a conspiracy to use the mails to defraud. The indictment contained ten counts. Counts 1 to 9, inclusive, charged all of the defendants, including the appellants, with nine separate violations of Section 215 of the Criminal Code, 18 U.S.C.A. § 338. The tenth count charged all of the defendants, including the appellants, with a conspiracy to commit the offenses charged in the first nine counts in violation of Section 37 of the Criminal Code, 18 U.S.C.A. § 88. In so far as appears from the record, no question has been raised by the appellants as to the sufficiency of the indictment.

The frauds upon which the indictment was found are frauds growing out of the Baker or Becker estates. Jacob Baker is reported to have enlisted as a surgeon in the Continental Army in the Revolutionary War and as a reward for his serv--

ices was rumored to have received extensive land grants, embracing some of the most valuable portions of the City of Philadelphia today, including the sites of the Wanamaker Store and of the City Hall. Jacob Baker is supposed to have died without heirs of the body, after further enlarging his reputed fortune by the West Indies trade, and to have left his property to his next of kin by a will alleged to have been dated in 1781. It was also rumored that these heirs of Jacob Baker fell into dispute, that for this reason the estate was never settled and that the heirs gave leases for ninety-nine years covering the lands which we have mentioned. It was reported also that very large sums were recovered by the United States Government under the French Spoliation Act for the destruction of Baker's ships in the West Indies trade, which were held in trust for the Baker heirs by the Government of the United States and by various banks. The estate was reported by the parties to the conspiracy to their dupes as possessing a value in excess of a billion dollars.

The business, and it was such, of collecting funds from the unwary to be used allegedly for expenses incurred in the collection of the assets of this mythical estate furnished a fertile field for the unscrupulous. Numerous associations were formed by individuals among the heirs of Jacob Baker. The means of exploitation pursued were invariably the same. An enrollment fee, usually in the sum of Ten Dollars, was asked and received. In return the dupe was "enrolled" among the heirs and thereby alleged to have become entitled to his share in the estate or estates. The record before us shows that the appellants have been engaged over a period of years in the collection of such fees, well knowing that the Baker estate was non-existent and well aware of the fact that the moneys paid by those they deceived would serve no legitimate purpose.

That one of the Baker heirs associations with which the appellants operated was entitled "The Central Executive Committee of the United Heirs of the Becker and Baker Leasehold Reversionary Estates of Pennsylvania". The appellant, William S. Miller, was the "General Secretary" of this committee or organization. The appellant, Blough, was its "Financial and Field Secretary", the appellant, Anderson, was designated as "Chairman, the Board

of Examination of Lineage", and W. Cameron Smith, an attorney, engaged ostensibly to aid in the collection of the assets of the estate, was designated "Chairman, the Board of Legal Investigation". The appellants, Fred F. Sprengel and W. H. C. Sprengel, brothers, and the appellant, Wolford, aided the others whom we have named in obtaining money under false pretenses and in using the United States mails to defraud.

As we have stated, the procedure employed was to enroll gullible individuals as heirs upon the payment of a fee. This work was facilitated by obtaining the records of at least one other Baker heir association, viz., the Johnstown group, with which certain of the appellants had been connected. When a group of Baker heirs had been contacted by the appellants, investigation was then pursued through family lines to endeavor to ascertain others connected by blood who might be duped. The amount of money collected by the appellants and their co-conspirators is not entirely a matter of conjecture. It appears to have amounted to hundreds of dollars and was sufficient to maintain at least certain of the conspirators over a period of years. We may state, however, that the picture presented by the record before us is one of unrelenting fraud in the prosecution of which the appellants had an equal or an almost equal part. In our opinion there can be no question of the guilt of the appellants. What we must decide is simply whether or not the appellants were granted such a trial in substance and form as the law requires.

We state at this point that the bill of exceptions is inadequate and not in accordance with the strict rules of criminal procedure. Many of the exhibits to which the appellants refer are described inadequately in the bill of exceptions which in itself seems to embrace both pertinent and impertinent matter. Nor was the appeal perfected within the period prescribed by statute. Two extensions for settling and filing the bill of exceptions were granted out of time by the court below, the orders granting these extensions being vacated later. A petition was then filed by the appellants in this court "* * * to authorize the filing of the assignments of error and the settlement of the bill of exceptions by the trial judge." An order granting the relief sought was entered by this court without prejudice however to

the right of the United States to move to strike the bill of exceptions and assignments of error as filed. The appeals then came before us for hearing.

To set aside these questions of procedure and to proceed to the merits of the appeals, we perceive prejudicial error to the appellants in the record before us. These errors may be described as falling into two categories: First, the introduction of testimony not sanctioned by the rules of evidence, in its nature bound to prejudice the appellants, and, second, remarks made by the prosecuting attorney in the course of the trial and in his address to the jury. The admission of certain other evidence to which the appellants have objected as being insufficiently connected with themselves or with the conspiracy in which they took part does not constitute prejudicial error in our opinion. Since all of these matters are closely related we will endeavor to deal with them together.

■■ It must be borne in mind that the defense offered by the appellants was one of good faith, that they were acting honestly and with the intention of securing an estate for the heirs and had been duped by Smith. The good faith of the appellants or the lack of it was therefore an issue to be determined by the jury. Now the rule of law is well settled that where it is alleged that a scheme exists to induce persons to pay money in return for an interest or interests in property shown to be non-existent, evidence of intent may be extensive in scope and its admissibility rests largely within the discretion of the trial court. Hartzell v. United States, 8 Cir., 72 F.2d 569, 584, certiorari denied 293 U.S. 621, 55 S.Ct. 216, 79 L.Ed. 708. The reasons upon which this rule is predicated were enunciated by the Supreme Court in Wood v. United States, 16 Pet. 342, 359, 360, 10 L.Ed. 987, as follows: "The question was one of fraudulent intent or not; and upon questions of that sort, where the intent of the party is matter in issue, it has always been deemed allowable * * * to introduce evidence of other acts and doings of the party, of a kindred character, in order to illustrate or establish his intent or motive in the particular act directly in judgment. Indeed, in no other way would it be practicable, in many cases, to establish such intent or motive, for the single act, taken by itself, may not be decisive either way; but when taken in connection with others of the like character and nature, the intent and motive may be demonstrated almost with a conclusive certainty."

■■ The record shows the following. W. Cameron Smith was engaged in the exploitation of Baker heirs from the year 1924 until the finding of the indictment against him in the case at bar in January, 1937. One William H. Baker, not a defendant, promoted six Baker heir associations over a period of many years. In June and July of 1929 Smith carried on negotiations with Baker with a view to combining their activities. About this time Baker entered into negotiations with Anderson, who was then the president of what is described as the "Johnstown Group". Smith later joined forces with Anderson and Miller. Anderson advised Baker heirs to get in touch with Baker, stating that he was "* * * on the right track". Anderson was well aware that the Post Office Department in 1929 had required Baker to desist from using the mails in connection with the promotion of his schemes. Smith had similar knowledge. Baker refused to join with the appellants. He threw in his lot with another group of promoters known as the "Biddle Group". Thereafter Miller attacked Baker as having become "* * * prey to evil counsellors * * *". One Bertha Dodson, who was the subject of a bitter attack by Smith, worked with the Biddle group. Dodson's motives were also attacked by the other appellants. The Biddle group possessed a forged will purporting to be the will of Jacob Baker. Miller attacked this forged instrument, as did Blough, Fred Sprengel and Wolford. Anderson informed the enrollees of their group that Dodson had attended Baker estate hearings before the postal authorities and had satisfied them of the existence of a Baker estate. He recommended Dodson as "* * * the only person capable of handling the case * *".

Another group of individuals who exploited Baker heirs was known as the "Rennick Group". The record shows that Miller was well aware of the activities of this group and when one of his own enrollees informed him of the conviction of Rennick and his wife, he replied, "I knew of their racket a long time past." Newspapers published in Seattle, Washington, which reported the trial of the Rennicks were mailed to Blough.

It also appears that in 1917 Wolford was president of the Johnstown branch of

the Baker Heirs Association, Inc., which we have referred to above. This purported to be a national organization. Anderson worked with Wolford to carry on this organization for a period of years. In 1920 Anderson was vice-president of the Johnstown branch and in 1929 was its president and acting secretary. At that time he had possession of all of its records. These were made available to all the appellants. The record shows that Miller introduced W. H. C. Sprengel, Fred F. Sprengel and Blough to Smith early in 1933 and they had frequent meetings and conferences until the latter part of May, 1936. In July, 1933, Miller and Smith both wrote to certain of their enrollees that "* * * the heirs of the old Johnstown Association have enthusiastically joined in our proceedings * * *". As we have stated all of the appellants were members of a committee termed the "Central Executive Committee of the Becker or Baker Heirs".

We think it is apparent from the foregoing that the conspirators, including the appellants, operated widely throughout the country and kept in close and often competitive contact with the other exploiting groups. In view of the foregoing we think that the prosecuting attorney was entitled to ask questions of the appellants concerning their knowledge of the activities of these other groups and to inquire of their activities from the witnesses at the trial, and many of the questions so asked were pertinent upon the issue of the good faith of the appellants and their co-defendants. It should be borne in mind that the activities of the appellants continued practically until the time of their indictment in January, 1937, and that therefore a period of many years was involved. We conceive therefore that it was proper for the trial court to allow the introduction of evidence as to the activities of groups not directly connected with the appellants or their co-defendants, so long as a connection with or knowledge of the activities of these groups were brought home to the appellants, to test the issue of good faith offered by the appellants in their defense. The latitude which the law allows, however, in this respect was exceeded.

We shall illustrate as follows. Certified copies of the record of the convictions of the Biddle group in their trial before the District Court of the United States for the Eastern District of Pennsylvania, showing the sentence of certain members of the Biddle group to terms of imprisonment, were introduced into evidence over the objections of the appellants' counsel. These convictions had occurred a few months after the indictment of the appellants and their co-conspirators. We can perceive no theory upon which such evidence was admissible. The Biddle group, though engaged in the exploitation of Baker heirs, as were the appellants, was a competing, not a co-operating group. Had the Biddle group been engaged in the very conspiracy in which the appellants were engaged such evidence would remain inadmissible under any theory. The guilt or innocence of the Biddle group was not in issue in the trial of the appellants. The presentation to the jury of evidence of the conviction of the Biddle group was bound to prejudice the appellants with the jury, the members of the jury being likely to conclude that since the Biddle group had been convicted the appellants should be convicted likewise. In addition to the foregoing there was put in evidence testimony showing that certain members of the Biddle group had attempted to bribe the Register of Wills of Philadelphia County. There was no testimony connecting the appellants or their co-conspirators with this activity.

To illustrate further. Testimony was introduced at the trial of the appellants that the unnamed mother-in-law of one Mildred Crosby many years before had contributed over one thousand dollars to an unnamed Baker heirs' organization. The activities of this unnamed organization were totally unconnected with the activities of the appellants.

It appears also that a number of bulletins gotten out by W. H. Baker, dated in 1929, published by the "Baker Heirs' Genealogical Association" run by Baker, were introduced in evidence. There is no testimony connecting the activities of Baker with the appellants except as we have heretofore indicated through the medium of Cameron Smith, and through a letter written by Anderson under date of September 30, 1929, to C. C. Wilson in which Anderson states that he thinks W. H. Baker's next bulletin "* * * will have the proper advice." Baker's "next" bulletin, if there was such, is not in evidence. There was no testimony to show that the appellants were in any wise responsible for the sending of the bulletins in evi-

dence through the mails or aided in their preparation or publication. These were the work of Baker alone, unaided by the appellants or their co-conspirators. The effect of these bulletins upon the minds of the jury must have been far reaching in indicating the existence of fraud because the statements are plainly fraudulent. For example; one bulletin, that of June 1, 1929, states, "I am sure that two-thirds of the heirs know that there is an estate in Philadelphia. They have been taught this from their youth.' One of our ancestors in his will left $1,000 for the settling of the Estate when the ninety-nine year lease expired."

■ A. T. Hawkesworth, the postal inspector in charge of the investigations of the Post Office Department in the Baker heir frauds, gave testimony in respect to one R. H. Baker, of Middletown, Virginia. The prosecuting attorney asked who he was. The questions and answers read as follows:

"Q. Who is R. H. Baker of Middletown, Virginia? A. He is a defendant in a prior case.

"Q. A defendant in a case pending in this Court at this time? A. Yes.

"Q. How was his case disposed of?" Over the objection of counsel for the appellants this question was answered as follows: "A. He is supposed to represent the Auxiliary of the League of Baker Heirs, located in Virginia.

"Q. Is he a defendant in this Court in another case pending now? A. He is.

"Q. Was his action disposed of the other day? A. It was. He pled guilty and was placed under sentence.

"Q. He pled nolo contendere? A. Yes, he pled nolo contendere."

We can perceive no ground upon which such testimony was admissible. Its effect may well have been to lead the jury to the inference that the appellants likewise were guilty. R. H. Baker was not connected in any way with the appellants or their co-defendants.

■ Inspector Hawkesworth also testified in respect to a chart prepared by W. H. Baker, claiming to show that the names listed were the descendants of a Jacob Baker who married Mary Magdalene. He was then asked how Baker operated in putting their names, those of "* * * prospective customers, on these maps and for how much money and so on"? The

question was objected to and the prosecuting attorney then asked:

"Q. Well, Mr. Hawkesworth, you went down, you have talked with the relations —McCollum, who is a defendant in the next case here, and who was convicted in the Biddle group two or three weeks ago in Philadelphia? A. Yes, sir.

"Q. He turned over to you all of the papers of W. H. Baker? A. Yes, sir. * * *

"Q. Can you state now the method that he was working in this Baker Estate and how he was using these maps? A. It would be almost impossible for me to relate the method adopted and used by W. H. Baker in the formation of these maps. * * *

"Q. Well, W. H. Baker had various and divers means of operating in the Baker Estate, did he not? He had a Wah-hoo Remedy Company he operated through, didn't he? A. After this stipulation was signed and W. H. Baker had agreed to no longer use the mails, to evade the force of a fraud order he took the name of the Wah-hoo Remedy Company and then sold the Remedy to the various persons with whom he had been connected in the Baker case, advising them that the proceeds secured from the sale of the medicine would go to the operating expenses of the investigation of the Baker Estate."

Counsel for the appellants moved that this testimony be stricken from the record upon the ground that it was immaterial and irrelevant. The motion was refused and the testimony remained before the jury. It was plainly prejudicial to the appellants. From it the jury might well have inferred that the appellants or their co-conspirators had admitted the fraudulent nature of their activities, since W. H. Baker had in effect admitted the fraudulent nature of his own.

■ Testimony as to the activities of Lillian A. Ryan was also given by Hawkesworth. He stated that she was "* * * a defendant in a case yet to be tried, and was indicted in this case but nolle prossed." The matter of Lillian Ryan's indictment in another case then pending before the trial court was referred to repeatedly in the testimony. This testimony was not properly admitted in evidence for reasons which we have heretofore indicated.

■ ■ Two questionnaires prepared by inspector Hawkesworth were introduced in

evidence. One was prepared and sent out prior to the indictment of the appellants and one was prepared and sent out by the postal authorities after the indictment of the appellants. Hawkesworth testified that they were sent to 3,900 persons. This fact was not pertinent and was indicative of a conspiracy much greater in scope than any in which the appellants or their co-defendants took part. Moreover, upon the questionnaires appear names of persons not connected by testimony with the appellants or their co-conspirators who were engaged in the exploitation of Baker heirs in other parts of the country. They were offered by the prosecuting attorney for the purpose of showing the scope and extent of the investigation made by the Postal authorities. This issue was immaterial and the questionnaires should have been stricken out upon this ground. Inspector Hawkesworth goes further, however, and states that in many of the cases investigated by the Post Office Department fraud orders were secured against persons operating Baker heirs groups. It is obvious that such testimony should not have been admitted or should have been stricken from the record, because it is not shown that the appellants or any of them were connected with the activities to which the inspector referred as a result of which fraud orders had been granted.

■ A further question arises in respect to testimony given by Inspector Hawkesworth in respect to the failure of the appellants to answer the questionnaires sent to them and the comments of the prosecuting attorney upon this matter in his address to the jury. We think that this matter also constituted prejudicial error to the appellants. The law is well settled that a defendant cannot be compelled to testify against himself and that a prosecuting attorney may not comment upon his failure to so testify. The question presented by this aspect of the case at bar is closely analogous. The appellants were not compelled by law to respond to the questionnaires of the Post Office Department and the fact that they did not do so does not present evidence that they acted in bad faith or were not acting in good faith. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; McKnight v. United States, 6 Cir., 115 F. 972.

■ The record contains other instances of testimony improperly admitted and which must have served to prejudice the appellants. In such testimony, however, we do not include the magazine article referring to the Rennicks conviction and their trial in Seattle. The article referred to was shown to have been mailed by Cora Baker Dwight to Miller and was referred to by him in a letter written by Miller to Mrs. Dwight upon April 21, 1935, in which, as we have stated heretofore, he made representations distinguishing between the activities of himself and his co-conspirators and the "racket" operated by the Rennicks. The letters referred to were properly in evidence and the magazine article is an essential part of the correspondence in order that it might be understood by the jury. United States v. Brown, 2 Cir., 79 F.2d 321.

We think that we have sufficiently indicated both the nature of the testimony which was properly introduced in evidence against the appellants and the nature of testimony which properly might not be adduced against them.

In addition to the foregoing we are of the opinion that the attorney prosecuting for the United States exceeded the limitations imposed upon him by law in respect to comments made during the course of the trial and to the jury in his closing speech. We will not refer to any of the exceptions taken by the appellants to his opening address to the jury. The prosecuting attorney's opening address is not in the record before us.

■ The prosecuting officer asked a witness, Wainwright, a dupe of the appellants and their co-conspirators, if he knew of any proceedings that were had in the course of the prosecution "* * * of this Baker Estate". The witness replied that he had read in a newspaper of Biddle. The prosecuting attorney then made the comment, "Oh, the prosecution where we put them all in jail." This was objected to by the counsel for the appellants who requested that a juror be withdrawn and the case continued. The trial court denied this motion and did not instruct the jury to disregard the comment of counsel for the United States. The comment was plainly prejudicial to the appellants, particularly in view of the attempts which had been made theretofore and which were made later to associate the Biddle group in the minds of the jury with the appellants.

■ A similar instance occurred when the prosecuting attorney, stating his reason

884

for referring to the case of Lillian Ryan, who was indicted upon another indictment in the trial court, said that reference to Lillian Ryan was "* * * brought in to show that they (the appellants and their co-defendants) are dealing with people indicted and a co-conspirator." It would appear that in making this statement the prosecuting attorney was attempting to condemn the appellants upon the strength of their association with persons subject to indictments or already indicted. That such conduct is prejudicial to a defendant's cause we think requires no elaboration.

. Furthermore in his address to the jury it is our opinion that the prosecuting attorney went beyond that field of fair comment allowed to him as a prosecutor. By this we do not mean that counsel for the Government transgressed intentionally in this respect, but in the heat of his address to the jury he described the appellants and their co-conspirators as possessing a "defiant attitude", saying also that if they were acquitted they would have letterheads printed stating, "We have been acquitted by a jury in Pittsburgh of all wrong. We are now going into this thing earnestly and we want all of the thousands of Baker heirs to enroll with us. We believe in it yet." These comments concerning what might constitute the future conduct of the appellants were prejudicial. The appellants were on trial for crimes which they committed, not for a course of future conduct.

 The prosecuting attorney also stated: "We have got to convict these people. They will go wild with this kind of thing. The only way it can be done is by conviction." Remarks of this tenor are intemperate in character and prejudicial in effect. Minker v. United States, 3 Cir., 85 F.2d 425; Pierce v. United States, 6 Cir., 86 F.2d 949; Ward v. United States, 5 Cir., 96 F.2d 189.

We consider that the remaining questions raised by the appellants present little ground for consideration and shall comment on but two of them. The appellants contend that the court erred in refusing to admit certain evidence adduced by the appellants in order to prove their good faith. We have examined the exhibits offered to this end despite the fact that they are not properly described by the bill of exceptions, and we conceive that they possess no great probative value for the purpose

for which they were sought to be introduced. We think that they should have been admitted, however, since they tend to corroborate the appellants' statements as to their first connection with Smith. The appellants also contend that there was not sufficient, proper and legal evidence produced by the Government to show that the appellants and their co-conspirators were not acting in good faith. We have touched upon this subject already at the beginning of this opinion. We state again that in our opinion the bad faith and ill intent of the appellants is amply demonstrated by good, sufficient and legal evidence.

As we have stated heretofore the bill of exceptions is inadequate in many respects. It is insufficient for many of the purposes for which it was intended and without the elaborate documentation of the evidence and exhibits to be found upon the Government's brief which has been carefully prepared and precisely written many of the questions raised by the appellants would be unintelligible. However, in our opinion, the bill of exceptions and the assignment of errors serve to raise sufficiently the questions upon which we have commented heretofore in this opinion.

 As we have stated, the orders extending the time for settling and filing the bill of exceptions were improvidently entered by the court below and were subsequently vacated. This court, however, possessed the power in the course of its jurisdiction of appellate matters to allow the bill of exceptions to be filed and the appeal perfected. Rule 9 of the Supreme Court, 28 U.S.C.A. following section 354, does not provide otherwise. See Ray v. United States, 301 U.S. 158, 57 S.Ct. 700, 81 L.Ed. 976.

██ ██ We reverse the judgments of conviction of the appellants with reluctance and in doing so we are not unaware of the rule laid down in Fitter v. United States, 2 Cir., 258 F. 567, 573, and the other cases referred to in Berger v. United States, 295 U.S. 78, 89, 55 S.Ct. 629, 79 L.Ed. 1314, in which the principle is enunciated that if the guilt of a defendant be "overwhelming" a judgment of conviction may be sustained even if prejudicial error has occurred in the course of the trial. There is so much error upon the record, however, so many instances of prejudicial matter being placed before the jury over the objec-

tions of counsel that we conclude that the rule adverted to by the Supreme Court in Berger v. United States, supra, is inapplicable. In our opinion the appellants have not had trial in accordance with the substance and form of our criminal law for the reasons stated. Their respective judgments of conviction are reversed and the causes remanded to the court below and a new trial is ordered.