STATE OF IOWA, appellee, v. JACK BERRY, appellant.

No. 47543.

(Reported in 40 N.W. 2d 480)

212

JANUARY 10, 1950.

Lundy, Butler & Lundy, of Eldora, for appellant.

Robert L. Larson, Attorney General, and Don W. Barker, County Attorney, for appellee.

SMITH, J.—The defendant presents three questions on appeal: 1. Whether certain statements of defendant's wife were admissible as part of the res gestae. 2. Whether uncontradicted evidence of defendant's insanity required a directed verdict of acquittal. 3. Whether certain arguments of prosecuting attorney were so prejudicial and unsupported by evidence as to warrant a new trial.

The alleged murder of Ernest Knott was committed shortly

after midnight of June 27, 1947, in Iowa Falls, Iowa. Earlier in the evening defendant and decedent and their wives and another couple had met in the kitchen of decedent's home for a drink before going to a dance. Defendant and his wife, Hester (decedent's sister) lived upstairs in the same house. Defendant and his wife went to the dance with decedent in his car. Decedent's wife did not go. Defendant left the dance alone about midnight, had some beer at a near-by tavern, walked home, got a gun which he had bought a few weeks earlier, and loaded it with shells just purchased that day. He went back downstairs but disclaims any memory of later happenings except that he thinks he sat on the well curb with the gun in his hand.

Decedent and Mrs. Berry left the dance later and came past defendant as he sat on the curb and, after a brief conversation with him, went into the house leaving him sitting outside. Mrs. Berry testifies as a witness for defendant that after she went upstairs she heard a shot. She came down and said to decedent, "I wonder if that damn fool shot himself." They went outside and found defendant "slumped down, his hands were on his knees hanging down and his head was down and his hands were limp. I slapped him and shooked him and laid him back on the platform. Ernie [decedent] found the gun down between his legs. Jack felt cold, he was ice cold. I couldn't arouse him."

Mrs. Berry further testified that decedent sat down beside defendant:

"Then Jack came to and he just started to swing and grab and was wrestling with Ernest there. They were laying down partly on the well curb and on the ground. I don't know who had the gun. I heard a shot but I don't know who done it. They didn't wrestle very long and they both got up and Ernie started backing, half running, down to the trees. He just shot, shot, shot, one right after the other. Ernest had the gun when they started to wrestle. When he was backing down to the tree he wasn't steady and he swung around and fell to the north of the tree. He had hold of the tree. Jack looked for his glasses and run into the house and I sneaked into the house and called Earl [another brother] and Ruth [Earl's wife]. There was no sound in the house. Earl said Arlene [decedent's wife] was asleep and they had a hard time waking her up."

According to Earl Knott's testimony his sister made statements to him when he arrived, at variance with her testimony (above summarized) as to what had occurred. The competency of his testimony in this respect is questioned on this appeal.

Arlene says she was asleep when her husband returned from the dance but awoke when he turned on the light. He was undressing when the first shot was heard and she testifies Mrs. Berry came running downstairs and called "Ernie come quick," also saying "Jack, Jack" several times and "the crazy fool probably shot himself, that is the thought he had in his mind." This witness apparently did not go outside but says "I heard four or five rapid shots right after one another and I heard Hester crying and kept calling 'Ernest, Ernie.' Then he [defendant] ran into the house. After he ran upstairs Hester came in. She phoned Earl. It was fifteen, twenty or twenty-five minutes before Earl came in the back door. I said to Earl, 'Jack is upstairs and I think he has got a gun.' * * * I heard Jack say when Earl started up the stairs, 'Don't come any farther you son of a bitch, I will shoot you too.' Earl jumped back." Earl got Arlene and defendant's little son out of the house and across the street to the home of Mrs. Nesbit, Earl Knott's mother-in-law.

Ora Knott, another brother of decedent, arrived after the tragedy while defendant was still upstairs. He testified that when he called to defendant to come down defendant answered, "Come on you big muscled chesty, you are next on my list." Joe Stiner, a policeman, remembered the words to be "mullet, or muscle brain" and said defendant threatened Ora Knott: "You try to come up here and I will give you some of the same."

The sheriff and other peace officers finally used tear gas to compel defendant to come down after he had defied everybody for an hour or more. He came out the upstairs window and down a ladder.

We have set out enough of the testimony to give a general picture of the fateful events of that night. There is of course an immense amount of detail omitted. We shall set out more as we discuss the questions raised on appeal.

At a preliminary hearing (at or after arraignment, under Code chapter 783) to determine defendant's then mental condition, a jury found him insane and he was committed to the de-

partment for criminal insane at Anamosa. Approximately a year later the State Board of Psychiatry pronounced him sane and he was returned to Hardin County for trial, resulting in his conviction from which this appeal is taken.

I. Defendant challenges the competency of testimony as to certain statements of Hester Berry, his wife, made shortly after the shooting. Five propositions are urged. Statements to be res gestae must be: (1) spontaneous (2) not in form of narrative (3) not consisting of opinion or conclusion (4) so closely connected with the transaction as to exclude opportunity for fabrication; and (5) voluntary exclamations and not in response to questions.

We have examined the authorities cited to support these propositions. Numbers 1 and 4 state the controlling considerations. Spontaneity and such closeness of connection with the transaction as to exclude any presumption of fabrication are the essentials. State v. Brooks, 192 Iowa 1107, 1115, 1116, 186 N.W. 46; State v. Stafford, 237 Iowa 780, 785–787, 23 N.W. 2d 832, 837. In fact the two are practically one, the element of spontaneity being the exact antithesis or denial of any thought of fabrication. The declaration must of course be so connected with the transaction as virtually to constitute a part of it or to grow out of it. In other words, the spontaneous utterance must be made while under the influence of the event. 32 C. J. S., Evidence, section 417.

In Stukas v. Warfield-Pratt-Howell Co., 188 Iowa 878, 888, 175 N.W. 81, 84, the rule is restated that the proper test of the admissibility of such statements "is whether they relate to the principal transaction and are explanatory of it, and are made under such circumstances of excitement, still continuing, as to show that they are spontaneous and not the result of deliberation or design. * * * Within this general rule, the admissibility of the declarations under the circumstances of the particular case is largely within the discretion of the trial judge. The facts and circumstances of no two cases can be precisely alike, and the exact length of time is not mathematically controlling." The quoted language is from Christopherson v. Chicago, M. & St. P. R. Co., 135 Iowa 409, 417, 109 N.W. 1077, 124 Am. St. Rep. 284, where many earlier cases are cited. It is requoted in Roushar v.

Dixon, 231 Iowa 993, 996, 2 N.W. 2d 660. See also Dedman v. McKinley, 238 Iowa 886, 892, 893, 29 N.W. 2d 337, 340. In 32 C. J. S., Evidence, section 403, at page 21, the same rule is succinctly stated. It is too well-established to require further citation.

The statements in question here are clearly within this sound rule. They have no appearance of fabrication. Rather they have every appearance of spontaneity. They were made by defendant's wife under circumstances that strongly suggest she was under the spell of the drama she had within the hour witnessed—practically taken part in. Immediately after the shooting she "sneaked into the house" and called her brother Earl. He lived about three blocks away. We are not concerned with the exact timing at this point. Earl got in his car and came. Defendant was upstairs. "Hester came around the house and hollered at me." The dead brother was lying outside. "She told me she thought Jack had a gun and she said, 'I think he killed Ernest.' I said, where is Ernest? She said, 'He is outside here.' We went right out and she showed me where Ernest was laying. * * * She said, 'My God! I don't know what I am going to do.' And she started to cry."

In response to further questioning of the witness he testified:

"She said that when they first came home Jack was sitting on the well * * * and she said, 'Jack, what is the matter with you' and he turned and said, 'Go upstairs to bed' and she and Ernest went into the house and [she] was taking off her dress and hanging it up when she heard a shot and she said she rushed down the steps * * *. Ernie went out and asked what was wrong. He looked down. And at first when he seen the gun he reached down to pick it up and said, 'I wonder where Jack got that gun?' and just that quick he grabbed that gun out of Ernest's hand and started firing. She said when Jack started for Ernest she grabbed his arms and tried to hold him and he * * * just threw her away from him."

Again we say the exact time of this conversation is not the important thing. It probably did not all take place at the same instant of time but it sufficiently appears she was, during all of

it, still under the influence of the tragedy she had just witnessed. Her brother was dead and she thought her husband had killed him. There had been no time, and there was no occasion, for inventing the story she told.

We can but inadequately imagine the mental torture the poor woman was suffering but we think it is clear she related what she thought she had seen. There was no fabrication.

Nor do we think the fact important, if it be a fact, that part of what she said was in response to questions asked her by her brother Earl. We cannot doubt the spontaneity of her statements however elicited. In State v. Stafford, supra, 237 Iowa, at page 785, a part of the declaration there admitted was "in response to a question." In Clark v. Van Vleck, 135 Iowa 194, 197, 198, 112 N.W. 648, 650, cited by appellant at this point, defendant tried to show his own declaration, made to plaintiff's father immediately after the accident. We said:

"The declaration made was called out by inquiries from the father and was self-serving in character. *These suggestions are not always controlling, however.* [Italics supplied.] The true test is: Were the declarations so closely connected with the transaction in question as to be, in effect, a part of it? Were they the natural and spontaneous utterances of the declarant, and so made as to indicate no opportunity for premeditation and design? They must also relate to immediate and present events, and not be merely a narrative of a past transaction or statement of opinion. And as a general rule the admissibility of such evidence lies largely within the discretion of the trial court. Christopherson v. Railroad, 135 Iowa 409. The real test seems to be the spontaneity of the declaration."

Citations and quotations could if necessary be multiplied almost ad infinitum. The discretion of the trial court is generally stressed. Here it was exercised with singular care and regard for the rights of defendant. There was no error committed in the admission of the testimony.

II. It is ably argued there should be a reversal: because defendant had been adjudged insane after the alleged murder and a year or more prior to this trial; because substantial evidence showed him to be insane when the act is alleged to have

been committed; and because there was no competent evidence that he was sane at that very time.

The argument is formidable upon the fact question of defendant's mental condition. Doubtless it was made to the jury with the same vigor and thoroughness as here. What we have to determine, however, is not the fact of sanity or insanity but whether there was sufficient evidence to sustain the jury's verdict as against the plea and showing of insanity. The issue before the jury was of course his mental condition at the time of the alleged murder.

The testimony is too extensive to permit an adequate summary. Undoubtedly there was ample evidence from which the jury could have found defendant insane but that is not the question. Was it sufficient to support the verdict rendered?

No complaint is made of the manner of submission to the jury though at one point it is said the verdict is contrary to the instructions. The difficulty of the question is illustrated by the language of the court in overruling the motion for new trial. After expressing the opinion there was a jury question on the insanity question the ruling continues: "And while the court might have been of a different opinion than the jury, nevertheless, the court finds that the jury was warranted in finding as they did." We are constrained to agree, though the evidence of insanity seems strong.

Defendant's mother testified to his birth in 1915; the almost immediate separation of his parents; his care committed to her own mother because she herself worked for a living; the boy's early sicknesses including "choking" spells when he would "pass out" one or two or three times a week; his jobs until his marriage at nineteen; his leaving school at thirteen while in the fifth grade.

She says he was hospitalized while in the Army and describes his peculiar conduct after leaving the Army:

"He had those spells and was nervous. He walked back and forth and would talk to himself and say he heard voices calling to him. * * * He thought a gray-headed man was always talking through the wall * * * was supposed to kill him and that he had a flashlight bulb in his head and could turn it off and on.

\* \* \* He would mumble and then on occasions \* \* \* scream and would swear."

Defendant's clinical record shows "Final Diagnosis: Psychoneurosis, reactive depression, severe, manifested by seclusiveness, self-concern, depression, despondency, and suicidal tendencies." The considerations upon which the diagnosis is based are set out in detail. His certificate of disability for discharge (C. D. D., dated May 6, 1943) was based on this diagnosis. The report of the Board of Medical Officers added, "The disability is permanent."

Dr. Collis Roundy of St. Joseph, Missouri, testified by deposition October 1947 as to defendant's mental status three years previously: "Berry was in bed in sort of a coma when I first saw him. His body was cold and he was starey-eyed. He appeared to be in severe shock of some sort. His reflexes were exaggerated. I thought it was a mild convulsion of epilepsy." He prescribed a sedative and saw the patient several days later. After detailing later developments the witness concludes: "I would say he was suffering from insanity. When I first saw him I checked him for liquor and failed to detect any odor. I am sure he wasn't drinking the second time."

Dr. O. R. Yoder, a psychiatrist, superintendent of the Ypsilanti State Hospital, Ypsilanti, Michigan, testified by deposition filed November 25, 1947, as to defendant's condition in 1945, based on examinations made at that hospital. They found no physical abnormalities but that he "was suffering from a chronic mental disorder, that he was insane and we classified this mental disorder as schizophrenia or dementia praecox of a paranoid type. We took into consideration the history of drinking but we felt that that was superimposed on a more chronic form of personality change within him, that it was secondary to what Jack Berry really was. \* \* \* It [schizophrenia] is a curable disease. \* \* \* There is no specific cause \* \* \* but it starts in early childhood. The paranoid type \* \* \* is associated with disturbance of sex urge. \* \* \* Alcohol many times may bring out this paranoid state \* \* \*."

The witness says they prescribed a treatment of occupational therapy but that it was "unsatisfactory from the fact that he

had this compulsion to kill himself. * * * We thought his prognosis was poor and did not expect him to recover. Homosexual tendencies would be in line with our diagnosis." They sent him to Fort Custer in November 1945.

On cross-examination this witness says Berry did not complain of voices but was "in a great state of conflict. He was pretty bad. A schizophrenic is subject to commit crimes of violence. They have no inhibitions and they have no hesitation in carrying out any impulse which may come to them. They are the most dangerous type of patient and would be more apt to be dangerous when under the influence of liquor. * * * Drinking alone cannot bring on schizophrenia." On redirect: "We ruled out manic depressive because that would have its ups and downs with lucid intervals. Berry's condition was continuous."

In addition to Dr. Yoder's testimony there is shown the probate order committing defendant to the Ypsilanti institution on the certificate of two "legally qualified physicians appointed in said matter."

On December 8, 1947, at the conclusion of the preliminary examination into defendant's then mental condition, the jury having returned a verdict that defendant was then insane, the trial court found his discharge "would endanger public peace and safety" and committed him, as already stated. We assume the depositions of Dr. Roundy and Dr. Yoder and the Michigan probate order were before the court and jury at that hearing and also the report, dated November 13, 1947, of the State Board of Psychiatry that, "In our opinion this prisoner is insane." It is signed by the four superintendents of state hospitals at Independence, Mount Pleasant, Clarinda, and Cherokee.

There is shown in the present record a similar report dated May 11, 1948, in which the Board again reported, "In our opinion this prisoner is insane." However, on November 9, 1948, the Board reported, "In our opinion this prisoner is sane." No facts are detailed in these reports of the Iowa State Board. They are made to the Board of Control of state institutions.

There is also testimony of nonexpert witnesses describing defendant's peculiar conduct during the time immediately preceding the tragedy. Several were coemployees at Swift & Company plant. The testimony of the foreman is fairly illustrative:

"He did a lot of sweating although the room temperature was only 60 to 65 degrees and he was doing no manual labor, * * * he mumbled and stared into space * * * and talked to himself * * *. He was awfully pale. Something seemed to be eating him more or less." The foreman also testifies defendant had to be transferred to another department because he was undependable: "If you give the man a pound of butter it would be 17 ounces or 15 ounces." This witness expresses the opinion, "During the last few weeks that he worked under my direction he was not of sound mind, and that was about the 15th of June, 1947."

Two other of these witnesses related an incident when defendant dropped some butter and ran over and hit his hands on the wall and screamed. These two however disclaimed being qualified to express an opinion as to his insanity.

Defendant's wife describes his conduct at some length. She describes fits of temper, acts of violence, his claim that voices were talking to him and that some gray-headed man was going to kill him, his mumbling and occasional screaming and cussing, crying spells, his occasional "passing out" and cold spells lasting five or ten minutes.

There is much more of this detail which need not be stated. The testimony of Dr. Barclay Funk, a medical doctor, specializing in psychiatry and instructor in it at the Iowa Psychiatric Hospital in Iowa City, bears most directly upon defendant's mental condition at the time of the alleged murder. He examined defendant first on September 15, 1947. Defendant was admitted to this hospital September 12 and discharged September 30. Dr. Funk says:

"Our diagnosis * * * was of a paranoid psychosis due to alcohol. This is in agreement with the diagnosis made at Ypsilanti State Hospital of a paranoid psychosis. We put it in a different sub-type. They placed it in schizophrenia. We placed it under alcoholic organic type of disease."

This witness, basing his opinion upon the history given him and his own examination of the defendant (which he described to the jury at length), testifies that defendant was insane on June 28, 1947. "He could not be held accountable for the difference between right and wrong." He also says, "The mental

conflict or psychotic condition occurred before the alcohol and basically his condition was due to this conflict. The psychosis was there before alcohol was introduced."

Dr. Funk was a witness for the State at the preliminary hearing and at that time stated the man should be committed. In his testimony here he explains his theory of defendant's trouble as coming "from conflict with his wishes to attempt to conform to what he feels is a suitable pattern of behavior and his inability to do so and his reaction to it."

As against this imposing showing of prior and present insanity the State relies entirely on nonexpert testimony. The rule that permits such testimony of sanity without detailing facts upon which the opinion is based is well-established and sound. The State cites State v. Maupin, 196 Iowa 904, 192 N.W. 828, 195 N.W. 517; State v. Thomas, 172 Iowa 485, 154 N.W. 768; and State v. Kilduff, 160 Iowa 388, 141 N.W. 962. The defense does not question this proposition but points out such testimony has little weight if the witness's opportunity to observe the subject is limited. Manifestly his testimony can only have value if he has been in a reasonable position to observe abnormal behavior if it had occurred.

The State here presents Freda Jacobsen, sister of Mrs. Earl Knott. She says, "I have seen Berry at Ernest's house. I have seen him three or four times since he moved to Iowa Falls but I don't know him very well. I didn't see anything unusual about Berry on the night of the dance. He just asked me to dance and I said no." Mamie Nesbit, her mother, says: "I live across the street from Ernest Knott's residence. I know Jack Berry. I saw him walk to work sometimes every day and sometimes every three or four days. He was in my home several times."

Earl Knott, Ora Knott, Ruth Knott, and Arlene Knott all testify to defendant's sanity. Manifestly their opportunities to observe him were ample. It is argued their testimony was not limited or directed to the time of the tragedy but we do not think the criticism is sound. The witnesses must have understood the real issue. Mrs. Nesbit testified as to the time "prior to the time of the shooting"; Ora, "during the month preceding the shooting"; Ruth, "during the months prior to June 28, 1947";

Arlene, "during the years, particularly the past year before the shooting."

The sheriff and deputy sheriff who had defendant in custody after his arrest and before his transfer say he was in their opinion sane. Some other coemployees at the Swift plant and casual acquaintances testified but their testimony was largely negative due, in part, to lack of sufficient contact with defendant to enable them to form a worth-while opinion, and to disclaimer of opinion.

The question of mental competency is of course for the jury if there is a material conflict in the testimony. State v. Brewer, 218 Iowa 1287, 254 N.W. 834; State v. Wegener, 180 Iowa 102, 162 N.W. 1040; State v. Geier, 111 Iowa 706, 83 N.W. 718. We do not try the issue anew on appeal. Our function, as is that of the trial court, is to determine whether there is substantial conflict.

If we were passing on the question as one of fact there are others things we might deem significant, e.g., the almost total absence of any evidence of motive and the fact that if defendant was sanely "lying in wait" for Ernest Knott he would not have allowed him to pass safely into the house when he (Ernest) and Hester first returned from the dance and stopped to talk to him.

But we are not triers of the fact. There is substantial conflict in the evidence and it was fairly presented by the instructions. A directed verdict would not have been justified.

III. The defense assigns error on account of claimed improper and prejudicial argument to the jury, particularly the following: "Do you realize that if you did say that he was insane and acquit him, he will be turned loose on the world again? If you do that, every day thank your God that when if you do that he won't go get a piece of sewer pipe, a fork or something and get howling drunk or crazy again and kill his family and the neighbors."

Exception to this was taken and the court admonished: "Proceed and keep within the record." The special prosecutor continued: "Don't the attorneys have any right to speculate? * * * Sometimes attorneys interrupt for the effect on the jury. I think that this is one of those times. * * * I am saying to you I fear for what will happen if you turn this man absolutely free

and say he was insane at the time. Then he is loose and if you say by a verdict in this case he was insane at the time he walks out of this court a free man and he can't be tried for this offense again. You are irrevocably putting this man in the clear where he would be free to go and act as he pleases. * * * He should be put away. At least put away somewhere where he cannot repeat the performance with anybody else."

And finally: "I say to you in the name of God if you don't want to sentence him for murder in the first degree, hold him where he can't do this again."

This was not an argument that defendant was sane and accountable for his acts. It was instead an argument that even though insane he should nevertheless be convicted because of the danger that he might "get howling drunk or crazy again and kill" someone else; that he should be found guilty, not because he was sane, but because he was dangerous. It was not an appeal to convict on evidence of sanity but in order to avoid possible repetition of an act which strong evidence indicated was due to insanity. In other words, it was not so much an argument for sanity as a warning against possible future acts of insanity.

It had no relevancy to the defense of insanity. It urged a reason for conviction which the jury had no right to consider. If defendant, while insane, killed his brother-in-law, he was innocent. If the jury thought him insane it was the jury's duty to acquit, regardless of any danger he might again commit homicide.

Not only was the argument improper, it was inflammatory and prejudicial. Doubtless attorneys, in their zeal, frequently overstep proper bounds in arguments to juries, when it can safely be said no harm has been done—that the error is without prejudice.

But that is not true here. There was an imposing showing defendant was insane. The only eyewitness account of the circumstances of the shooting lent some credence to that theory. While we think there was a jury question it was close. The situation required the greatest care to insure its submission without appeal to the fears or prejudices of the jury, but there was no effort to curb the prosecutor, or to warn the jury against the poison his argument generated.

In 23 C. J. S., Criminal Law, section 1107 (commencing on page 584), it is said: "\* \* \* it is improper for the prosecuting attorney \* \* \* to make any comments tending to prevent them [the jury] from arriving at a verdict solely by impartial deliberation on the evidence, and free of any improper considerations." And in 53 Am. Jur., Trial, section 500, page 404: "Where counsel goes beyond an appeal to the jury to do their duty and enforce the law and urges a conviction because of extraneous considerations \* \* \* the argument is improper." See also language in United States v. Sprengel, 3 Cir., Pa., 103 F. 2d 876, 884 (point 21); and Maynard v. State, 106 Tex. Crim. Rep. 558, 293 S.W. 1104, 1106 (point 6).

There is not much help to be had from precedents except as they announce the general principles we have attempted to state. The application of these principles must depend on the peculiar facts of each case. In the present case, considering the state of the record on the question of sanity we think there was prejudicial error in refusing to grant a new trial.

We do not mean any personal criticism of either court or prosecution. The heat and pressure of trial sometimes make difficult the task of maintaining the aloof perspective and balance necessary in the trial of one charged with commission of a heinous crime. That burden rests on the appellate court with its greater opportunity for care and reflection. We would not unduly hamper the State in the prosecution of criminal cases. But on the other hand it is our duty to see that the one charged with crime is granted the full measure of protection to which an enlightened system of law entitles him.

Because of the considerations we have pointed out the case must be reversed and remanded for new trial.—Reversed.

BLISS, C.J., and HALE, MANTZ, OLIVER, WENNERSTRUM, and MULRONEY, JJ., concur.

GARFIELD, J., concurs in Divisions I and II, but dissents from Division III and the reversal.

HAYS, J., dissents from Division III, but would reverse on the ground that the verdict was against the clear weight of the evidence on the question of sanity.