STATE OF IOWA, appellee, v. PAUL A. LEAHY, appellant.

No. 47952.

(Reported in 54 N.W.2d 447)

JULY 28, 1952.

Frank J. Margolin and George A. Gorder, both of Sioux City, for appellant.

Robert L. Larson, Attorney General, Raphael R. R. Dvorak, Assistant Attorney General, and Wallace W. Huff, County Attorney, for appellee.

MULRONEY, C. J.—Paul A. Leahy was indicted and tried for assault with intent to do great bodily injury. The jury returned a verdict of guilty and the court sentenced him to serve an indeterminate term not exceeding one year in the penitentiary and placed him on parole. Many of defendant's assignments of error claim the evidence was insufficient to sustain the verdict.

The defendant was a lieutenant of detectives on the Sioux City police force. Sometime before 2:30 in the morning on January 6, 1950, defendant's wife was wounded by a bullet from defendant's revolver. The shooting occurred near the Peet Paint Company building in Sioux City. Officers Warnstadt and Schmidt investigated the shooting and they interviewed Mrs. Leahy in the hospital. After they left the hospital they located defendant in the vicinity where the shooting had occurred. Warnstadt asked Leahy to let him see his pistol but Leahy refused. The officers then told him to come with them to the police station; that the chief wanted to talk to him, and he said he would but first he wanted to go to the Chesterfield Club for a drink. He was in the Chesterfield Club for three or four minutes and then he came out and rode with the officers in the police car to the station. They arrived at the police station between 3 and 3:30 in the morning and went directly to the squad room to await the arrival of Chief of Detectives Gibbons. The chief arrived about fifteen minutes later and he entered the squad room with officer O'Keefe.

Officer Warnstadt testified Leahy was standing facing the door as Gibbons and O'Keefe entered the squad room: "Leahy said 'hello' to them * * * Gibbons was about a step in front of Leahy there and Leahy pulled out his pistol and pointed it at

Gibbons. Gibbons knocked the gun down, stepped behind him, raised his arm, and I stepped in and took the pistol away from him; the defendant had it in his right hand, the barrel end of the gun was pointed toward Gibbons * * *."

Officer Schmidt testified: "I heard a commotion and the first thing I saw was when Harry Gibbons was holding Mr. Leahy's gun arm up and Warnstadt took it away from him; I did not see the pointing of the gun and didn't see it withdrawn from the holster; I saw Warnstadt take it out of Leahy's hands; I don't recall there was anything fell to the floor; I heard Mr. Leahy say, 'If you wanted it, why didn't you ask for it?' and Gibbons said something about how come he had it out in the first place, then Leahy said, 'I thought the communists were taking over the police station.' That was after Warnstadt had taken the weapon from him."

Officer O'Keefe testified: "I saw defendant about 3:30 in the morning * * * I arrived with Chief Gibbons, who had telephoned me to pick him up; I entered the squad room first; I walked past officer Leahy; he spoke to me and I spoke to him; I heard scuffling behind me, turned and saw Gibbons holding Leahy's right hand up with his right hand, I believe. Leahy had the gun in his hand. Officer Warnstadt reached up and grabbed the revolver; I did not hear any conversation between Gibbons and Leahy; I talked to Leahy right after this incident; he had been drinking and was a little argumentative; the gun can be discharged as fast as you can pull the trigger; there were three unexpended shells in it."

The following is a portion of the testimony of . Chief of Detectives Gibbons: "I followed O'Keefe into the squad room, and nodded to the defendant. He had a topcoat on, I can't say whether he had a hat. I don't remember of addressing him. Just nodded at him. Q. As you walked diagonally across this squad room, what happened? A. I was just a little past Leahy when he pulled his revolver from his holster. Q. What did he do when he pulled his revolver? A. As soon as he pulled his revolver, I grabbed it, grabbed his gun arm, his gun hand, knocked it down and moved to my right around him and pushed his gun arm up with my right hand into the air. He was in a standing position. He might have—to draw his revolver he would have to crouch

just a little, he would come up with it. * * * Q. Is that the position he was in, as you were just there? A. Yes, in firing position. Q. In firing position? A. That is what we call it, yes, sir. Q. Was the gun pointed at you butt first? A. No, sir. Q. Which end of the gun was pointed at you? A. Muzzle or barrel first. Q. Where was it pointed, at what part of your anatomy? A. About this, about my center."

As to the conversation that occurred at that time Chief Gibbons testified: "A. He said, 'You don't have to wrestle me around. If you wanted that gun, why didn't you ask for it. I didn't know who you were.' Q. What was that last? A. He said, 'I didn't know who you were.' Q. Then what did you say? A. I says, 'What did you pull it for in the first place.' Q. What did he say? A. He says, 'I thought the communists was taking over the police station. You never know what is going to happen, you know.' * * * I was standing in back of him when this was said, and this was after the gun had been taken away from him."

Defendant's version of the incident was that he took his gun from the holster in order to hand it to the chief but he was grabbed by Gibbons before he could complete the act of surrendering his gun. He testified: "Gibbons walked toward me; I had my holster and gun on me. Exhibit '8' is a gun holster which I had on me on my belt to the side. After Gibbons entered the room, I put my hands on the butt of the revolver. I started to pull it out of my holster. I may, or may not, I guess I must have had the barrel clear out of my holster, otherwise he couldn't have got it clear up in the air. I had it in that position when he grabbed my arm, threw it up and they grabbed hold of me. The reason I was removing my gun from the holster was, well, that revolver had been involved in a shooting. I knew he would want to see it and, being my superior officer, he was the one to turn it over to. I had no chance to complete the giving of the revolver over to him, because I just had the gun in that position and they grabbed me. He grabbed me and threw my arm up. Warnstadt grabbed me. Nothing had been said between Gibbons and myself up to that time. My right hand was on the butt of the revolver. I had just taken it out of my holster. Like I say, I may have had the barrel out of the holster. My left hand was hanging loosely at my side. I was taken by surprise when

they grabbed me. * * * When Gibbons took hold of me, he threw my arm up and pulled my left arm back; Warnstadt came over and took the gun out of my hand when it was up in the air like this. I did not struggle or put up any resistance. I said to Gibbons and Warnstadt, 'If you wanted the gun, why didn't you ask for it? My God! You would think the communists were taking over the police station.' I did not at any time point that gun at Harry Gibbons, nor point it in the direction of Harry Gibbons; I did not want to shoot Harry Gibbons, that is silly. * * * There wasn't any conversation that Gibbons asked why I pulled the gun and I replied I didn't know him. I recognized Gibbons and all the other officers. I never used the words 'You can never tell what might happen.' I did not have any ill feelings toward Harry Gibbons at that time, and as far as I know, he didn't have any against me."

 I. The crime of assault with intent to inflict great bodily injury can be established by proof that defendant pointed a loaded gun at a person under circumstances constituting a threat to shoot. State v. Mitchell, 139 Iowa 455, 116 N.W. 808; 6 C. J. S., Assault and Battery, section 79b. There was evidence here by officer Warnstadt and Chief Gibbons that defendant pointed the loaded gun at Gibbons. There was but little testimony showing circumstances that constituted a threat to shoot. There was no spoken threat. The remarks made by Leahy at the time were not threatening and they would not necessarily indicate an intention to shoot. Two other officers in the room did not see the defendant point the gun. Officer O'Keefe said defendant spoke to him and he spoke to defendant as he walked past him and the first thing he saw was when he turned around and saw Gibbons holding Leahy's right hand with the gun in it up in the air. Officer Schmidt was in the room and he did not say he had his back turned at the time the chief entered. He said he did not see the pointing of the gun. He states the first thing he saw was when the chief was holding defendant's arm up in the air. Even officer Warnstadt testified that defendant gave the normal greeting of "hello" to O'Keefe and the chief as they entered the squad room and walked toward him. Warnstadt said the chief was about a step in front of defendant when the latter pulled out his pistol and pointed it at him, while the chief testified

he was a little past Leahy when the latter pulled his revolver from the holster. Chief Gibbons' testimony as to defendant's pointing the gun at him was practically nullified on his cross-examination. The defendant was not immediately charged with this crime. He was charged with intoxication and that charge was dismissed the next morning. The indictment is dated more than a year after the alleged assault. About all there is that might indicate an intention to shoot is the chief's testimony that defendant assumed a slight crouch or "firing position" as he drew the gun. We think the question is close, but viewing the evidence in the light most favorable to the State we hold it sufficient to support the verdict.

■ II. One assignment of error challenges the sufficiency of the indictment. The indictment charges that defendant "did unlawfully, wilfully and feloniously with a deadly weapon, being a revolver then and there held in the hands of him, the said defendant, Paul A. Leahy, assault another, to wit, Harry Gibbons, with the intent to inflict great bodily injury, all in violation of section 694.6 of the 1950 Code of Iowa." This indictment was sufficient since it is largely in the words of the statute and it refers to the section of the Code creating the crime. Section 773.3, Code, 1950. In fact it is within the form statute, or section 773.34, Code, 1950, permitting such an indictment in the following language: "A.B. assaulted C.D. with intent * * * to inflict great bodily injury."

■ III. Defendant complains of an instruction defining simple assault as a menace or attempt to do unlawful violence to the person of another, coupled with the means, ability and intent to inflict the threatened injury. The defendant states the instruction is "possibly correct as an abstract statement of the law" but complains because "it furnished no guidance to the jury under the facts in this case." The argument seems to be that the instruction was inadequate because it failed to define "menace" and "attempt" and it assumed there was evidence showing a menace or attempt to inflict unlawful violence when in fact there was none. There is no merit in the objections. There was evidence of defendant's pointing the gun at the chief and we have previously pointed to the chief's evidence as to defendant's crouch or firing position. In any event, since defendant was found

guilty of the aggravated assault he is not entitled to object to the instruction on the included offense. State v. Rutledge, 243 Iowa 179, 47 N.W.2d 251, 50 N.W.2d 801.

■ IV. The first section in chapter 694 of the Code of 1950 (section 694.1) provides for the punishment for simple assault— up to thirty days in jail or up to $100 fine. The next section (694.2) provides for the same punishment for willfully drawing or pointing a gun at another. As pointed out in the previous division the trial court submitted the crime of simple assault. Defendant predicates error on the trial court's failure to also submit the crime prohibited by section 694.2, Code, 1950. This statute merely defines a certain kind of simple assault and provides for the same punishment as simple assault. It would have been proper for the court to submit it but we do not think the court was required to submit both simple assault and what amounts to a specific simple assault by willfully drawing or pointing a gun at another. In the absence of a request therefor we would not hold the court's failure to substitute the specific simple assault for the general simple assault was prejudicial error.

■ V. There is some merit in defendant's complaint about the evidence concerning the wounding of defendant's wife by a bullet fired from defendant's gun. Repeatedly in his opening statement to the jury and in questions propounded to witnesses on direct and cross-examination the county attorney referred to this shooting. It is doubtful if all evidence of that shooting could have been kept from the jury for it was the police investigation of that shooting that resulted in defendant being brought to the police station. But there was no need to emphasize it. All of defendant's witnesses were interrogated as to their knowledge of the earlier shooting of defendant's wife. And when defendant took the stand he was asked this question on direct examination: "You have heard some testimony here, and you have testified to some extent of your wife being in the hospital at that time and that she had been injured by a bullet that had been fired from this revolver and regarding which Mr. Gibbons wanted to talk to you that morning. Were you charged and was there a trial and a jury verdict in reference to that injury to your wife in this district court?" The county attorney objected to the question as being improper in form, leading, not relevant or material

to any issues here involved. The court sustained the objection. The transcript shows that later on in redirect examination when defendant was explaining that one of his suspensions was based on an indictment for shooting his wife he was allowed to state he had been tried on that indictment and the jury returned a verdict of not guilty. With all of the testimony introduced by the State with regard to this shooting there should have been no hesitation on the part of the trial court to allow defendant to show it was without criminal liability. Standing alone the court's ruling would probably not be prejudicial error because substantially the same evidence was admitted on redirect, but there were other rulings where evidence vital to defendant's defense would be excluded and somewhat similar testimony admitted.

VI. One such instance occurred in defendant's direct examination. He described what had occurred but he did not, in so many words, say he was withdrawing his gun to turn it over to Gibbons. He said: "The reason I was removing my gun from the holster was, well, that revolver had been involved in a shooting. I knew he would want to see it and, being my superior officer, he was the one to turn it over to. I had no chance to complete the giving of the revolver over to him because I just had the gun in that position and they grabbed me * * *." Defendant's counsel asked the following question: "What did you say you were going to do with the revolver when you were taking it from the holster?" The State objected to the question as "being repetitious, calling for the conclusion of the witness and invades the province of the jury." The objection was sustained. A similar objection plus the objection of "leading" was sustained to the next question inquiring whether defendant was "going to turn [his] revolver over or hand it over to Mr. Gibbons in the condition that it was in [his] holster." In the next question he was asked if he anticipated any difficulty in turning his gun over to Mr. Gibbons at that time and the State's objection as "calling for conclusion, leading and suggestive" was sustained. A little later on in this direct examination he testified without objection that he did not want to shoot Gibbons, but still later when he was asked: "Did you want to injure Harry Gibbons that morning?" the court sustained the State's objection as "call-

ing for the conclusion of the witness, being leading and suggestive." We think all of the State's objections to the above questions should have been overruled. Defendant should have been allowed the utmost liberty in stating his purpose and intent as he drew his pistol from the holster. People v. Doud, 223 Mich. 120, 193 N.W. 884, 32 A. L. R. 1535. This was the vital question in the case. The only objection by the State that has any merit at all is the objection of "repetitious" to the first question in the above series. But the validity of that objection depends upon a holding that defendant's prior testimony is an unequivocal statement that he withdrew the gun to hand it over to Gibbons. This prior testimony is not a clear statement to that effect. On this important issue the defendant should be entitled to make a clear statement of his intent even though the fair import of prior testimony shows his purpose. Even if it be slightly repetitious the defendant should have the right to dispel any possible doubt as to the intent he claimed to entertain at the time.

VII. Somewhat the reverse situation exists with respect to a portion of the State's testimony where officer Warnstadt was asked by the county attorney: "Is there any doubt in your mind at all as to whether he was handing the gun to him or pointing it at him?" Defendant's counsel objected to the question "as calling for a conclusion; invading the province of the jury and the province of the court." The objection was overruled and the witness answered: "I don't think he was going to hand it to him, no." The court then overruled defendant's motion to strike the answer as "speculative." Thus the court allowed the officer to state his mental reaction—his thought (apparently free from doubt) that defendant was not going to hand the gun to Gibbons, while denying the defendant the right to make a clear statement that that was his intention.

The court's ruling cannot be sustained. Officer Warnstadt had testified flatly that defendant pointed the gun at Gibbons so it cannot be said he would be competent to testify as to his conclusion on a matter which could not be described, within the rule of such cases as State v. Dickson, 200 Iowa 17, 202 N.W. 225. Nor can it be said the testimony would be competent under the holdings in cases where the mental reaction of a witness is material to ascertain the reasons or influences that induced certain action on his part, within the rule of Yeager v. Incorporated

Town of Spirit Lake, 115 Iowa 593, 88 N.W. 1095, and Colburn v. Krabill, 232 Iowa 290, 3 N.W.2d 154.

The question of whether the defendant withdrew his gun from the holster to shoot Gibbons or hand it over to Gibbons was the ultimate fact in issue for the jury to decide. The witness could not express his opinion upon that fact. Halligan v. Lone Tree Farmers Exch., 230 Iowa 1277, 300 N.W. 551. When the question is carefully parsed it probably could be answered by "yes" or "no." But we feel the ordinary witness would understand the question called for a statement as to his opinion on the purpose for which defendant withdrew his gun. Defendant's purpose in withdrawing the gun could not be the subject of opinion testimony of another.

In addition to the matters stated there was much testimony concerning defendant's suspensions from the police force and testimony that some of these suspensions were for intoxication, neglect of duty, and conduct unbecoming an officer. Some of this testimony was admitted over defendant's objections and some was admitted without objection. Perhaps no single assignment of error would alone constitute a ground for reversal. But we feel the cumulative effect prejudiced the defendant. The evidence was very nearly insufficient as a matter of law to sustain the verdict. In this situation the case calls for reversal "for errors which otherwise might not constitute reversible error." Chapman v. Head, Tex. Civ. App., 279 S.W. 906, 908. As said by Justice Smith in State v. Berry, 241 Iowa 211, 224, 40 N.W.2d 480, 488, where the question on the direction of the verdict was close and the assigned error was an improper argument:

"The situation required the greatest care to insure its submission without appeal to the fears or prejudices of the jury * * *."

With so much emphasis in the record of defendant shooting his wife, his intoxication, and his bad conduct as an officer, the erroneous rulings on the relevant issue of his intention to surrender his gun or shoot are magnified. After a careful consideration of the entire record we are of the opinion the judgment should be reversed.—Reversed.

BLISS, WENNERSTRUM, SMITH, HAYS, and THOMPSON, JJ., concur.