STATE OF IOWA, appellee, v. HENRY SOMMER, appellant.

No. 49188.

(Reported in 86 N.W.2d 115)

NOVEMBER 12, 1957.

Allan L. Keck, of Maquoketa, and E. C. Halbach, of Clinton, for appellant.

Norman A. Erbe, Attorney General, Raphael R. R. Dvorak, First Assistant Attorney General, Asher E. Schroeder, County Attorney of Jackson County, and J. R. Sokol, Assistant County Attorney, for appellee.

BLISS, J.—The Information was printed, with blank lines for signatures, names and dates. We set out verbatim the back of the Information, to wit:

"STATE of IOWA, JACKSON COUNTY, ss.

162

I, J. R. Sokol, being duly sworn, do depose and say that I am County Attorney of Jackson County, Iowa; that I have made a full and careful investigation of the facts upon which the above charge is based, and that the allegations contained in the above and foregoing instrument are true as I verily believe.

S/ J. R. Sokol

Subscribed and sworn to by J. R. Sokol before me, the undersigned, this 17th day of September A. D. 1956.

(Seal) G. Edward Binns, Clerk District Court.

On this 17th day of September A.D. 1956 _____, Judge of the District Court, being satisfied from the showing made herein that this cause should _____ be prosecuted by information, *the same is approved disapproved and the charges ordered submitted to the next grand jury.* [Italics ours.]

S/ Arthur F. Janssen, Judge of the District Court.

This Information, together with the minutes of the testimony relating thereto, is duly filed in the District Court this 17th day of September A.D. 1956.

G. Edward Binns, Clerk of the District Court of Jackson County, State of Iowa.

Bail is hereby fixed on the within Information in the sum of $5000.00.

S/ Arthur F. Janssen

Judge of the District Court."

The Minutes of Testimony attached to the Information notified the defendant that Richard Efferding would testify that without cause or provocation the defendant assaulted him with a spade resulting in severe lacerations of the right arm and stomach.

A bench warrant was issued on September 17, 1956, and was served by the arrest of defendant on the following day. Defendant was admitted to bail.

On September 27, 1956, the County Attorney filed a "Motion For Permission To Amend Information" consisting of two counts. Count 1 simply asked to fill in the name "Jackson" in the caption of the Information. Count 2 asked permission to strike from the back of the Information the words, "disapproved and the charges ordered submitted to the next grand jury." The court granted Count 1, but denied Count 2, with the remark

that it was "improper." At this time in open court, the County Attorney said: "I will state for the record that Ground 2 of that motion, that the State withdraws Paragraph 2 of the Motion For Permission To Amend the Information as previously filed herein on September 27, 1956." On the latter date and before pleading the defendant filed his motion to set aside the Information because of its illegality, and alleged:

"Defendant calls particular attention of the court to the fact that said information, on the back of the last page thereof, carries an order executed by Hon. Arthur F. Janssen, Judge of the District Court, and said order purports to both approve and disapprove the said information, and the following language appears therein: 'The same is approved disapproved and the charges ordered submitted to the next grand jury.' Defendant construes said quoted language to be a clear and unquestionable order of this court to submit this charge to the next grand jury."

The motion also called attention to section 769.7 of the 1954 Code of Iowa, which provides: "The information, before being filed, shall be presented to some judge of the district court of the county having jurisdiction of the offense, which judge shall indorse his approval or disapproval thereon. If the information receive the approval of the judge, the same shall be filed. If not approved, the charge shall be presented to the next grand jury for consideration."

Upon the filing of the foregoing motion, the State filed its Motion For Permission To Amend the Information hereinabove noted. The court overruled defendant's motion to set aside the Information and upon its renewal thereafter the court again overruled it. Defendant at this time pleaded not guilty to the Information.

On October 24, 1956, the State filed notice to defendant of its intention to introduce testimony of Dr. F. J. Swift, Jr. and of the parents and the wife of Richard Efferding, the prosecuting witness, relative to his injuries and appearance and declarations after the alleged assault. On October 29, 1956, before the jury was impaneled and sworn, the defendant demurred to the amended information on grounds alleged in his previous motions, and for the reason that it had never been approved by the Judge,

and that the minutes of the testimony filed with the Information, or the notice of additional testimony did not tend to support the essential element of intent in the crime charged, which should be reduced to one of simple "Assault and Battery." The demurrer was denied.

On November 6, 1956, and prior to the entry of any judgment, the defendant filed motion in arrest of judgment, based largely on his earlier attacks on the Information. The motion was denied on the day it was filed.

The pertinent facts involved in this appeal are substantially as follows. The defendant-appellant was born and reared in Jackson County where he had been engaged in farming for approximately fifty years, largely on his land northeast of the town of Fulton, where he was living with his wife, at all times pertinent.

On or about March 1, 1956, Richard Efferding, with his family took possession of a farm of about twenty acres lying due west of defendant's farm. A north-south county road separated the two properties. Soon after coming into the neighborhood, Mr. Efferding became quite active in seeking donors of money to gravel this road. He was unsuccessful in his venture. The defendant declined to contribute. Mr. Efferding and others then made application to the Jackson County Board of Supervisors to vacate the road. The defendant opposed the application and was represented at the hearing before the board by Mr. Keck, who appears for him on this appeal. The supervisors ordered a portion of this road to be closed, but thereafter took no other action with reference to the closing of the road, and it never was, in fact, closed or barricaded by the county. Defendant used the road in going north from his farm, and had made a wire-gate opening onto the road from a lane on his property leading to his buildings. The gate was kept closed by a wire loop encircling the top of the opening post of the gate and the top of the stationary fence post, and by a similar loop at the bottoms of these posts.

About September 1, 1956, Richard Efferding placed a fence post, with a board at its top, at about the middle of the road as a barricade. Shortly thereafter the defendant-appellant removed

it and threw it in the ditch on the Efferding side of the road. A little later Mr. Efferding replaced the post and barricade at about its first location. They again disappeared and were not found. Efferding searched the neighborhood for them and discussed the matter with these neighbors intimating that he suspected Mr. Sommer of their removal and disappearance. The latter consulted his attorney, Mr. Keck, in the forenoon of September 15, 1956. Shortly thereafter in that forenoon, Mr. Efferding, knowing that Mr. Keck was Mr. Sommer's lawyer, called on him and told him that while he had no evidence of the fact, he was of "a frame of mind" that Mr. Sommer had stolen his fence post, and that he was considering the filing of an Information so charging him. Mr. Keck cautioned him against doing this when he had no evidence of it and told him to wait until he could write a letter to Mr. Sommer asking him to come in for a conference. Mr. Efferding replied that he was "disturbed over the post", and repeated that he was going to file an Information accusing Mr. Sommer of stealing his post. He was advised by Mr. Keck to "go home and relax until this conference takes place."

Mr. Efferding left Mr. Keck's office shortly after the noon hour and went at once to see Fred Cornelius, a member of the Jackson County Board of Supervisors. Of this meeting, Mr. Efferding testified:

"Before I went home, I saw Mr. Cornelius, and he suggested that we get together Monday or Tuesday, and we were going to go out and survey it, and I was going to tell Mr. Sommer that very same thing, so if he would see them down there surveying he wouldn't think I was trying to pull something, so he would know the County was doing it.

"Mr. Keck: Q. * * * Your testimony is, you went to see Fred Cornelius after you had called on me? A. Well, it was after dinner.

"Q. And he told you, as I understand your testimony, that the County would undertake to survey this for you? A. To try to settle—yes, to try to settle this controversy. Well, I didn't know this for sure. They just told me that they [the supervisors] would survey the road Monday or Tuesday."

Respecting this subject, Mr. Cornelius testified:

"I am familiar with the subject matter of this trial, and I recall the date September 15, 1956. I had a conversation with Richard Efferding that day.

"Q. Did you ever say to Mr. Efferding in that conversation that you would get together with him the following Monday or Tuesday and survey this road? A. No. * * * Mr. Efferding came to see if the Board of Supervisors would ask or tell the County Engineer [Mr. Brownell] to survey the vacated road to establish the line between Mr. Sommer's and his property, and I told him that when a road is vacated it becomes a private property and that the Board of Supervisors and the Engineer are through with it, and I suggested to him that he might call on the Engineer and ask him as an individual if he would do it, or what I really suggested was that he get an abstractor or an attorney to check his abstract and the road to find out what part of that road, if any, would revert to him."

Mr. Efferding accepted neither the advice of the lawyer he consulted nor that of Supervisor Cornelius. Within two or three hours after contacting them, and about three o'clock in the afternoon of September 15, 1956, he drove his automobile to the crude wire gate of defendant, and opened it, and leaving it open, drove his car up the farm lane about a quarter of a mile to the gate of the farmyard. He did not stop his car when he reached this gate, but he turned it around so that it faced down the lane by which he entered, enabling him to make a more prompt departure. He and the defendant had a clear view of each other from the time that Mr. Efferding had entered the premises.

Defendant had been digging out thistles that forenoon for some time before in another part of the farm and had come to the yard to get a drink of water. He had a tool which he had made, for digging thistles, consisting of a pitchfork handle to which he had attached a metal blade at the lower end. He had a double structure in the farmyard consisting of two buildings under one roof, with a passage or areaway between them. One building was a corncrib, the other a tool house. In the passage or areaway was a discarded truck which had not been moved in three years.

Upon satisfying his thirst, defendant went to this building and after leaving the "thistle-digger" against the doorframe of the tool house with the metal part up, he knelt on the floor at the rear of the truck, to repair a loose hose connection on a hand-operated air pump.

What does the record show as to the preceding conduct of Mr. Efferding? As noted above, he had told Mr. Keck he was of "a frame of mind" that Mr. Sommer had stolen his post and he contemplated making such a criminal charge against him. He testified that at approximately three o'clock in the afternoon of the 15th of September, 1956, he went to the Sommer farmyard.

"Q. And you went to his place and you were looking for him, isn't that right? A. Yes, I saw him before I left.

"Q. And, as you say, you were disturbed? A. In a way, yes.

"Q. And you were disturbed when you were in my office the latter part of the forenoon? A. Yes.

"Q. And you told me again you were going to file an information against him accusing him of stealing your post, did you not? A. I might have.

"Q. Well, you remember you were pretty angry at the time, weren't you? A. I was just disturbed over the post.

"Q. Well, all right, and you were disturbed enough to tell me that you were going to accuse this man of theft, when you had no knowledge of whether he was guilty or not of such charge. You were disturbed enough for that, were you not? A. Yes.

"Q. And—we will call it disturbed—you were also disturbed enough to repeat this at least twice, weren't you? A. I don't remember whether I did once or twice.

"Q. You don't remember how many times you said it, do you? A. No, I don't.

"Q. And you went on his place looking for him, and you found him, is that right? A. Yes.

"Q. He didn't go looking for you, did he? A. No, he didn't."

In his redirect and re-cross-examination Mr. Efferding testified that when he discussed with Mr. Sommer the possibility of his signing the petition (to vacate), and the matter of graveling this road the discussion was peaceful: "He didn't abuse me in any fashion, He conducted himself as a peaceful, law-abiding

citizen. He didn't see things my way. I was disturbed. * * * I didn't have any particular argument or quarrel with Mr. Sommer with reference to the closing of this roadway at any time up to Saturday the 15th [1956]."

With reference to this meeting on the 15th Mr. Efferding testified:

"After fence post No. 2 disappeared I couldn't find it. I concluded somebody had taken it.

"Q. Is that the reason you went to Mr. Sommer's place? A. Well, I didn't know for sure he had taken it.

"Q. I understand that, but will you answer the question? Was that the reason you went to his place? A. Well, to see if I could see the post, yes.

"Q. Yes, and that is what you meant when you asked him 'if he had seen your fence post floating around'? Is that what you were referring to, that disappearing post No. 2? A. Yes, I was referring to that, but I didn't outright accuse him of it.

"Q. Well, you asked him if he had seen it floating around? A. Yes."

When the witness asked the last question noted above he was looking at defendant's woodpile and defendant was at the double building.

Continuing his testimony, he stated: "To my surprise, while I had my head turned, he said 'You have been asking for this for a long time'. That's when I got it. He charged right at me with a spade and I ran through the gate to my car as fast as I could. He struck at me with the spade across my right arm and struck me across the stomach and cut my belt in two. I had nothing in my hands. When I got to my car I backed it up and struggled to get to my house." His wife then took Mr. Efferding to his parents' home and then to the hospital.

The witness was asked without objection: "At the time this incident happened, will you tell the court and jury what Mr. Sommer's manner appeared to be as he came at you with the spade? A. Well, I wouldn't say it was very good. I just caught the movement out of the corner of my eye. I was looking at the post pile, and when I looked around he was right in front of me, and all I could do was just to make a slight movement at the time and save my life, but that was all. Q. What did it

appear to you he intended to do? (Objection that the question called for the incompetent opinion and conclusion of the witness was overruled.) A. Well, it appeared to me that if I wouldn't have moved, he would have got me clear through my stomach. I know it was about that level."

Defendant's version of the encounter was that while he was on his knees repairing the tire pump Efferding approached him and asked if he had one of his posts and he told him repeatedly that he did not have any of his posts, and that was all that was said; during this time Efferding was facing him with his fists clenched on his hips and his arms akimbo; after the talk ended he acted like he was going to attack him.

"He came right in front of me while I was down on my knees working on that pump. He had his left-hand fist closed close to his body in a horizontal position and the right arm and fist extended in a leading position and he moved toward me. Everything went pretty fast. He kind of drawed back like I was going to get a poke while he was advancing toward me. At that time the weed digger was still standing by the doorjamb where I left it right in front of me. I grabbed that weed digger and started to rise and came up in front of him to protect myself. This all happened pretty quick, more or less simultaneously. I never struck a lick. I held it out in front of me to ward him off. I never left the tool house to go near Efferding. I never stepped past the threshold of the tool house. When he swung I think he hit the end of that digger. Then he grabbed it with his left hand and gave it a yank across this way [indicating]. The underside of his arm came in contact with the end of the weed digger. I didn't know he got any other cut. I was pretty near standing up by that time. I could not have retreated from the position in which I found myself. I was within three feet of the door, the tools over this way and the crib on the other side. I did not intend to do him any harm or bodily injury or to attack him or to retaliate. All I wanted him to do was to get away from there. He got in his car and drove off. I did not follow him out of the tool house to the gate. I never left the tool shed. My wife was at home when this took place. She was in the kitchen on the other side of the house. She did not see or know that this incident had taken place."

No one other than the participants saw what took place in the encounter.

With respect to the barricades, defendant testified: "I saw him [Efferding] erecting the first post and board barricade. I dug it out and knocked the board off and slung them over on his side of the road. In a few days he put in another one. I never touched that one. He says it disappeared."

Appellant assigned eight errors upon which he relies for a reversal. The assignments in substance are: (1) Failure to sustain the motions, to set aside the Information, which were timely made and before plea, and the subsequent overruling of the demurrer raising the same question; (2) error in denying the challenge made to the juror, Edwards; (3) overruling objections to questions asked Efferding as to what Sommer apparently intended to do at and just preceding the encounter; (4) overruling defense objection to the general question asked Efferding as to the absence of anything in the association of himself and defendant which would cause the witness to believe there would be violence, and then unduly restricting the cross-examination of the witness; (5) in overruling defendant's objections to certain testimony given by Dr. F. J. Swift, Jr.; (6) overruling objections to testimony of Evelyn Efferding to statements made to her by complaining witness, Efferding; (7) overruling defendant's objections to the testimony of the witnesses, Lucille and William Efferding, describing the appearance of complaining witness after the encounter with defendant; (8) errors in the trial of a case, even though not sufficient individually to constitute reversible error, may as a whole be sufficient grounds for reversal.

Reference to other testimony hereinbefore noted is necessary before discussing some of these assignments. Upon leaving defendant's farm after the encounter, Richard Efferding, the prosecuting witness, drove his car in about two minutes to his home about a quarter of a mile distant, where his wife, Evelyn, heard him calling and came from the house. She had last seen him between five and ten minutes just previous. She testified:

"He came up over the bank to our yard. It was quite a steep bank. I observed that Richard had a hold of his right arm with his left hand, and where I could see his hand over his arm hang-

ing down, you could see some tendons there which had been cut and the blood was running from both arms. I had a conversation with him at that time." The witness was asked by the State what that conversation was. Objection was made to any testimony as to what Efferding told Mrs. Efferding "at a time when the defendant was not present, for the reason that it is not and cannot be binding upon this defendant. It purports to ask for a conversation that contains self-serving and hearsay testimony, and the testimony being narrative in character and contained within a conversation in response to questions and answers, the same cannot be considered as part of the res gestae. Its only purpose is to re-emphasize the complaining witness's testimony, and he is present in court and competent to testify, and has testified, and to allow this witness to repeat it is prejudicial to the defendant.

"The Court: Overruled. You may answer. A. I said, 'Richard, what did you do?' And he said, 'He did it'. I said, 'Who?' He said, 'Henry hit me with a spade' and as we went on around the house I asked him what had happened, and what we were going to do first, and he said, 'We will have to tie it up'." (The right forearm was then tied with an electric light drop cord.)

Evelyn Efferding then took her husband in the car to the farm home of his father and mother, William and Lucille Efferding, who observed Richard in the back seat of the car. The parents were witnesses for the State. The father was asked to tell the jury what he observed with reference to Richard's condition.

Defendant objected "to pursuing this line of questioning, for the reason that it is repetitious, cumulative, incompetent, irrelevant and immaterial to any issue in this cause, can serve no useful purpose other than to re-emphasize the fact which has already been established, that the complaining witness was injured, and it is prejudicial to the defendant."

Dr. F. J. Swift, as a witness for the State, previous to this question, had fully described the wounds of Richard and the treatment he gave them.

The objection was overruled, and the witness answered: "Well, I looked in the car, and Richard was sitting back there

with his arm held up by the door post where it opened, and looked in, and I see it all open here [indicating]. I could see some bones, and things that I thought was cords, and I knew right away what I had to do. I had to get him to the hospital. * * *." The witness then wandered in his answers to matters of no relevance. On objection the court struck the latter matters, but left that part of the answer as noted above.

The mother was then called by the State and was asked to tell her observance of Richard. She answered: "Well, he was laying there with his head in the corner, and he was holding his arm like this [demonstrating]. I see the—." At this point defendant objected to "further testimony along this line, on the grounds that it is repetitious, cumulative, incompetent, irrelevant and immaterial to this inquiry, and not tending to prove or disprove any matter in issue here." The objection was overruled and the witness continued: "He was holding his arm. That towel was wrapped around it, was all soaked with blood, everything was, and the flesh here [indicating] was pushed down. I could see the bones and tendons. Q. What else did you observe? A. He was very pale from loss of blood."

Dr. F. J. Swift, Jr., for the State, testified that about 3:30 in the afternoon of September 15, 1956, he examined Richard Efferding in the Jackson County Hospital at Maquoketa. His examination disclosed two wounds. One was on the flexor portion of the right arm, which was losing a great deal of blood. The other wound was in the right upper quadrant of the abdomen. To stop the bleeding in the arm a blood pressure cup was put on his arm, and arrangement was made for a blood transfusion. The blood from the abdomen was not very extensive. The surgery consisted in ligating the ulnar artery and other veins and arteries in the forearm. Both wounds were what the doctor described as incised—made with a sharp instrument—without any contusion or bruising. They were remarkably clean wounds, free from any foreign matter. It was the doctor's opinion that both wounds were made with a slicing type of movement. He said: "They were sweeps that were completed through. I have tried to determine a position where both of

these wounds could be cut with the same blow, but it is difficult to imagine that position. In my opinion, there was more than one blow."

There was no objection to the quoted testimony just above. But after the doctor had described the wounds at length, defendant interposed: "May I interrupt just a moment? I would like to urge on the court that this testimony has served its purpose, and gone far enough at this time. To continue it further is merely cumulative and repetitious, can serve no useful purpose other than to emphasize the fact that the man was injured, and further testimony thereon is immaterial, irrelevant and incompetent."

After the objection was overruled the witness continued. He was asked:

"Do you have an opinion, Doctor, based upon these same facts of examination and treatment of these wounds, as to what the reasonable and probable consequence would have been, had he not received immediate treatment?

"Mr. Keck: Just a moment, please. That is objected to as immaterial and irrelevant, and calling for incompetent testimony as to any matter in issue in this case, can't possibly be involved in this inquiry.

"The Court: Overruled.

"Mr. Sokol: Would you read the question back to him? (The pending question was read back by the reporter.)

"Mr. Keck: Your Honor, I want to renew that objection, and again reiterate the ground that it is immaterial, irrelevant and incompetent, doesn't tend to prove or disprove anything in issue here.

"The Court: Overruled.

"A. I would say that it would be death, from blood loss. I believe he was in the hospital for eleven days."

We will discuss appellant's assigned errors in their numerical order.

█ I. The basis of the first error assigned is that the County Attorney's Information filed with the Clerk of the Jackson District Court did not show it had first been approved by a Judge of that court, as required by section 769.7 of the 1954 Code of Iowa, which provides: "The information, before being

174

filed, shall be presented to some judge of the district court of the county having jurisdiction of the offense, which judge shall indorse his approval or disapproval thereon. If the information receive the approval of the judge, the same shall be filed. If not approved, the charge shall be presented to the next grand jury for consideration."

Section 769.8 of said Code provides that after the approval of an information, and before trial, the court, or any judge thereof, on its own motion, may order the information set aside and the cause submitted to the grand jury. No such order was made.

Code section 769.16 states five grounds for setting aside the information, by motion, of which ground 5 is: "When the information has not been approved as required." Section 769.17 provides that such motion must be made before plea is entered by the accused, otherwise the objection shall be deemed waived. The attacking motions in the case at bar were timely made.

The equivocal wording in the Information before us, respecting approval or disapproval, is unfortunate. A similar issue was before this Court in State v. Nova, 206 Iowa 635–637, 220 N.W. 41, prosecuted by an information, except in that case the eleven words beginning with "disapproval" were enclosed in a paren-thesis. In that case the information was not attacked on this ground in the trial court. Our opinion in that case states (page 636): "It is manifest that the court signed a blank form, which was so framed as to serve the purpose either of approval or disapproval. The disapproval form was inserted between parentheses. In a grammatical sense, the parenthetical expression is no part of the sentence which was signed by the judge. The argument for appellant is that the judge both 'approved' and 'disapproved', and that one canceled the other. If it be true that these two words mutually canceled each other, yet sufficient remained to show the approval of the judge. Independent of the word 'approved' the judge expressly found 'that this case should be prosecuted by information.' This, of itself, was an approval, even though the word 'approved' was not contained therein. It was indorsed upon the indictment [sic] as required by statute. While, therefore, the form of the indorsement was somewhat irregular, because of the failure of the judge to erase the paren-

thetical expression, this irregularity was by no means fatal to the validity of the indorsement. Furthermore, the point was not raised in any manner in the district court. See State v. Fortunski, 200 Iowa 406. It was as available to the defendant there as it is here. Counsel recognizes this fact, but urges a failure of jurisdiction. We are satisfied that the irregularity was not jurisdictional, even though it were erroneous. An assignment of mere error thereon is not available to the defendant, for want of raising the question below."

All Justices concurred with Justice Evans except Justice Albert, who dissented without opinion.

The record in the above case justified the affirmance on the single ground that the error relied upon was first raised in this court, and the reasoning of the opinion with reference to the parenthesis has no application on this appeal. We have no parenthesis here, if any pertinence should be given to that fact. The eleven words respecting disapproval are just as clearly in the indorsement as are those referring to approval. But the intent of the Judge clearly appears. The equivocal indorsement was signed by Judge Janssen on September 17, 1956. The Information as shown thereon was filed the same day, as appears thereon over the signature of the Clerk of the Jackson District Court. Section 769.7 provides that, "If the information *receive the approval of the judge,* the same shall be filed." The reasonable inference is that it had received such approval. On the Information, signed by Judge Janssen, is the following indorsement: "Bail is hereby fixed on *the within Information* in the sum of $5000." The bench warrant given on September 17, 1956, and executed the following day, recites that it was given "by order of the Judge of Court."

We are convinced that the failure of the Judge to strike from the Information the eleven words, respecting his disapproval, was merely an oversight on his part. There is no reversible error in the first assignment.

II. Error is assigned for rejecting the challenge for cause against the juror Edwards. It appeared from his voir dire examination as a prospective juror that he had lived for about twenty years in the neighborhood and was acquainted with both

the defendant and Richard Efferding. He stated that he had formed quite a little opinion of the whole case, as to who was right and who was wrong, which was not fixed, or certain, and was not one that could not be changed, or which he would be reluctant to change, if it developed during the trial that his opinion was wrong. He was examined at considerable length by the court and both counsel. In answer to counsel's question he stated his feeling and opinion to be such as would take evidence to change. The question eliciting this answer is familiar to all lawyers and others conversant with court trials. Of this interrogation this court in State v. Burzette, 208 Iowa 818, 823, 222 N.W. 394, 397, speaking by Justice Evans, said: "The state of mind thus described is incorporated in the question. It is a *stock* question, and it is too hoary to be condemned. It must be said, nevertheless, that it serves little function in ascertaining the real state of mind of a juror. The question calls for an affirmative answer, and always receives one."

But his concluding answers were that his opinion was not from anything he knew about the case, but from what he had heard, and that if selected as a juror he could give each of the parties a fair deal and treat them exactly the same, and decide the case solely on the evidence produced in court, and on the court's instructions. The juror was removed on defendant's fourth peremptory challenge. We find no error in denying his challenge. The challenge was specific in that it was based upon the juror's state of mind as expressed by him in the observation of the court, which has a large discretion in ruling on such challenges. We note nothing in the record that such discretion was abused. We have so often passed upon the issue presented that we call attention to but a few of our decisions. State v. Rhodes, 227 Iowa 332, 288 N.W. 98; State v. Anderson, 239 Iowa 1118, 1124–1125, 33 N.W.2d 1; State v. Harding, 205 Iowa 853–855, 216 N.W. 756; State v. Williams, 197 Iowa 813, 817, 197 N.W. 991; State v. Wheelock, 218 Iowa 178, 180–182, 254 N.W. 313; State v. Ralston, 139 Iowa 44, 48, 49, 116 N.W. 1058.

 III. Defendant complained of a question to Efferding as to what defendant's manner appeared to him to be as he came at him with the spade, and his answer was that "he would have

got me clear through my stomach." He was asked to state his mental reaction to a situation and conduct that could not be described to the jury precisely as it appeared to him, and the inquiry was proper. State v. Graham, 203 Iowa 532, 534, 211 N.W. 244; State v. Dickson, 200 Iowa 17, 23, 202 N.W. 225; Yahn v. City of Ottumwa, 60 Iowa 429, 430–433, 15 N.W. 257; Grismore v. Consolidated Products Co., 232 Iowa 328, 344, 5 N.W. 2d 646; State v. Shelton, 64 Iowa 333, 338, 20 N.W. 459; 3 Jones, Commentaries on Evidence, 2298; Vannest v. Murphy, 135 Iowa 123, 125, 112 N.W. 236.

■ IV. There was no undue restriction of the cross-examination of Richard Efferding. In direct examination the State had him state his age, which he gave as twenty-four years, and the fact that he had been married eight years and had four children. He testified that his relations with defendant had been such that he had no reason to expect any violence from him on September 15 when he called on defendant. On cross-examination he was asked if he went to high school and participated in athletics, and he answered that he had. He was then asked if he won a letter in wrestling. The subject had not been touched on in direct examination. There is no merit in the fourth assigned error.

■ V. Doctor Swift had treated Mr. Efferding's injuries at the hospital within half an hour after they had been received. He was asked if he had an opinion from his examination what the probable consequences would have been had Mr. Efferding not received immediate treatment. Defendant's objection that the question called for immaterial, irrelevant and incompetent testimony on a matter not in issue was overruled. The nature of the wounds and the probable consequences were matters bearing directly upon the charge in the Information of the willful assault *with intent to inflict great bodily injury*. It was necessary for the State to establish that the injury intended was·of a more grave character than an ordinary battery. State v. Crandall, 227 Iowa 311, 316, 317, 288 N.W. 85; State v. Grimm, 206 Iowa 1178, 1180, 221 N.W. 804; State v. Gillett, 56 Iowa 459, 460, 9 N.W. 362; State v. Brackey, 175 Iowa 599, 157 N.W. 198.

The difference between an assault and the crime charged against the defendant is the specific intent to inflict an aggravated injury. The State was required to show this specific intent.

178

The testimony of the doctor was admissible for the bearing it had in establishing that aggravation.

VI. The statements made to Evelyn Efferding by Richard Efferding were within a few minutes after the assault charged against the defendant. They were made at a time when Richard was severely injured in the encounter with defendant and when he was hurriedly seeking relief for his injuries, and although they were in answer to Evelyn's inquiries as to those injuries they were natural declarations, spontaneously and instinctively made under the influence of the event. They were admissible as part of the res gestae in which he was a participant. They were so contemporaneous with the encounter with defendant as to exclude any premeditation or fabrication on his part. They were so connected with the event as to be a part of it. They were properly received. State v. Berry, 241 Iowa 211, 215, 40 N.W.2d 480; State v. Stafford, 237 Iowa 780, 784–786, 23 N.W.2d 832; State v. Korth, 204 Iowa 1360, 1365, 217 N.W. 236; State v. Lewallen, 198 Iowa 382, 389, 390, 199 N.W. 266. Their admission rested largely in the sound judicial discretion of the trial court.

VII. The testimony of the parents of Richard Efferding were as to the physical condition and the injuries of Richard, which they observed shortly after the encounter with defendant. The fact that they may have been cumulative or repetitious was not a bar against their admission, which rested largely within the discretion of the trial court.

It is our conclusion that the defendant-appellant had a fair trial and that the errors assigned considered individually or as a whole do not entitle him to a reversal of the judgment.

It is therefore—Affirmed.

All JUSTICES concur.